# Illinois Official Reports

## Appellate Court

---

### *People v. Velasco*, 2018 IL App (1st) 161683

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v JOSE VELASCO, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-1683 |
| Filed | June 15, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 99-CR-20534; the Hon. Thomas Gainer Jr., Judge, presiding. |
| Judgment | Affirmed in part, reversed in part, and remanded. |
| Counsel on Appeal | Bluhm Legal Clinic of Northwestern Pritzker School of Law (Megan G. Crane, Laura H. Nirider, and Steven A. Drizin, of counsel, and Courtney Cronin, Kathryn Hogg, and Marco Minichiello, law students), and Valorem Law Group (Stuart Chanen, of counsel), both of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Iris G. Ferosie, Assistant State's Attorneys, of counsel), for the People. |

Panel                    JUSTICE ROCHFORD delivered the judgment of the court, with
                         opinion.
                         Presiding Justice Reyes and Justice Lampkin concurred in the
                         judgment and opinion.

## OPINION

¶ 1        A jury convicted defendant, Jose Velasco, of first degree murder, and he was sentenced
           to 45 years' imprisonment. Defendant subsequently filed an amended postconviction petition,
           alleging actual innocence and ineffective assistance of trial counsel. The postconviction court
           entered two orders: (1) a July 1, 2014, order, dismissing his actual innocence claim at the
           second stage without an evidentiary hearing and (2) a May 16, 2016, order denying his
           ineffective assistance of counsel claim after a third-stage hearing. Defendant appeals the July
           1, 2014, and May 16, 2016, orders. We reverse the second-stage dismissal of defendant's
           actual innocence claim and remand for a third-stage hearing. We affirm the third-stage denial
           of defendant's ineffective assistance claim.

¶ 2        Defendant was charged with the first degree murder of the 15-year-old victim, Juan Luna
           (the victim). At the jury trial, Andrea Thomas and Michelle Scott testified that, at about 2:30
           p.m. on August 7, 1999, they drove Ms. Thomas's boyfriend, Jevon Ollins, to his job at
           Tito's Tacos, located at 1852 S. Blue Island Avenue in Chicago. Ms. Thomas and Ms. Scott
           saw defendant standing outside the restaurant. Defendant asked Ms. Scott whether she and
           Ms. Thomas wanted to buy some cocaine, and Ms. Scott declined. Ms. Scott testified she
           commented on defendant's hair, the style of which (short except in the back) she found
           unusual. Ms. Thomas and Ms. Scott eventually left the scene.

¶ 3        Meanwhile, the victim and his friend, Danny Garcia, were at the home of the victim's
           sister, Veronica Luna, and her husband, Javier Sepulveda. Ms. Luna testified that her home at
           1916 S. Loomis Street was in the territory of a gang known as La Raza. However, the nearby
           intersection of 18th and Loomis Streets is in the territory of a gang known as the Ambrose, a
           rival of La Raza. Defendant was a member of La Raza, but the victim was not. Ms. Luna and
           Mr. Sepulveda testified that defendant and the victim were good friends. Mr. Sepulveda also
           testified that, while it was not safe for members of one gang to go into the territory of a rival
           gang, Tito's Tacos was considered a neutral zone.

¶ 4        At approximately 2:30 a.m. on August 8, 1999, the victim, Mr. Sepulveda, and Mr.
           Garcia decided to walk one block to Tito's Tacos to pick up some food and drinks. Ms. Luna
           testified that she waited outside for the three of them to return. Ms. Luna was concerned for
           the victim's safety because an Ambrose "chief" named Willie Perez was pressing charges
           against the victim for breaking Willie's car windows.[1] Mr. Sepulveda and Mr. Garcia went
           inside Tito's Tacos, while the victim waited outside.

¶ 5        During this same time period, Ms. Thomas and Ms. Scott returned to Tito's Tacos to pick
           up Mr. Ollins at the end of his shift. The area was lit by street lights and lights from Tito's

           _____

           [1]Benita Luna, the victim's mother, testified that the victim had been charged with breaking the
           windows on Willie's car in July 1999 and that Willie yelled angrily at her and the victim in the hallway
           on a court date in that case. Benita also testified that defendant and the victim were friends.

Tacos. Ms. Scott testified that, after she exited the car, she saw defendant approach the victim, and they argued. Ms. Scott and Ms. Thomas then saw defendant reach to his side, pull out a gun, and shoot the victim. The victim ran, but collapsed across the street, and subsequently died. Defendant ran away. Ms. Luna testified that she heard the shot and saw a man she could not identify running toward 18th and Loomis Streets (Ambrose territory).

¶ 6     Ms. Thomas testified that the police arrived almost instantly. Mr. Ollins closed up Tito's Tacos and left with Ms. Scott and Ms. Thomas, without speaking to the police.

¶ 7     Ms. Scott testified that, later that day, Mr. Ollins told her that the police wanted to speak with her. Ms. Scott went to the police station, where she gave two detectives a description of the shooter based on his clothing, haircut, bad acne, and a teardrop tattoo under his right eye. The police showed Ms. Scott a series of photographs, from which she identified defendant. Ms. Scott also returned to the police station that evening, where she identified defendant in a lineup. Ms. Scott testified to prior convictions for forgery and possession of cannabis with intent to deliver.

¶ 8     Ms. Thomas testified that, three days after the shooting, she also identified defendant from a photo array and subsequently identified him in a lineup. Ms. Thomas testified that she was placed on probation for a drug possession charge, but she denied receiving any favors for her testimony in this case.

¶ 9     Following all the evidence, the jury convicted defendant of the first degree murder of the victim, and he was sentenced to 45 years' imprisonment. On direct appeal, this court affirmed defendant's conviction. See *People v. Velasco*, No. 1-02-1793 (2003) (unpublished order under Illinois Supreme Court Rule 23).

¶ 10     On January 18, 2013, defendant filed an amended postconviction petition, claiming actual innocence based on newly discovered evidence and ineffective assistance of trial counsel based on counsel's failure to call alibi witnesses.

¶ 11                                I. Actual Innocence

¶ 12     In support of his claim of actual innocence, defendant attached (1) the unnotarized statement of Andrea Thomas, (2) the unnotarized statement of Claudia Cruz, (3) the affidavit of Jevon Ollins, (4) the affidavit of Jonathan Meskauskas, (5) the affidavit of Lynda Tricarico, (6) the affidavit of Max Hernandez, and (7) the affidavit of Erica Vargas.

¶ 13                          A. The Unnotarized Statements
¶ 14                                1. Andrea Thomas
¶ 15     In her statement, dated April 19, 2010, Andrea Thomas stated that both she and Ms. Scott were drunk and high when they dropped off Mr. Ollins at Tito's Tacos on August 7, 1999. There were many Hispanic teenage boys standing outside Tito's Tacos, and most of them had the same "strange haircut" in which "their heads were shaved except for long tails in the back."

¶ 16     Ms. Thomas and Ms. Scott were still drunk and high when they drove back to Tito's Tacos several hours later to pick up Mr. Ollins. Ms. Thomas and Ms. Scott were having a conversation outside Tito's Tacos when they heard a gunshot. Ms. Thomas ducked down beneath the car's dashboard and yelled to Ms. Scott to get down. Ms. Thomas never got a

clear look at the person who fired the gun, and she does not know whether defendant was the shooter.

¶ 17   After the shooting, Ms. Thomas initially avoided the police because she previously had been arrested for selling and possessing drugs and had missed a court date, and she believed there was a warrant out for her arrest. Mr. Ollins told her, though, that the State would "quash" her arrest if she would cooperate and identify the shooter. Ms. Thomas went to the police station, where the police took her to a room in which Ms. Scott was sitting, and they were left alone together. Ms. Scott had previously identified defendant's photograph, and she described the photograph so that Ms. Thomas would be able to identify the same person.

¶ 18   After speaking with Ms. Scott, the police questioned Ms. Thomas alone. Initially, Ms. Thomas told them that she had not seen the shooter, but the police told her she would be locked up and would "lose" her child if she did not cooperate. The police showed her some photographs, "indicated" to her the one she should pick, and she picked out the photograph of defendant. Ms. Thomas had "no idea whether the boy [she] selected was the actual shooter."

¶ 19   After the identification, Ms. Thomas's arrest warrant was quashed and she was allowed to go home with the understanding that she was being released in exchange for her cooperation and testimony against defendant. Ms. Thomas's charges were reduced to possession of a controlled substance, and she ultimately received one year of probation.

¶ 20   At defendant's trial, Ms. Thomas identified defendant as the shooter. Her testimony was untrue, but she felt that she had to identify defendant so as to avoid "more probation, prison time, or other negative consequences."

¶ 21   In 2010, someone from the Northwestern University Pritzker School of Law (Northwestern) met with her in prison and asked her about the shooting. She agreed to recant her statement because her trial testimony has "haunted [her] conscience for the last 10 years" and she wanted "to set the record straight."

¶ 22                                    2. Claudia Cruz

¶ 23   In her statement, dated November 30, 2007, Claudia Cruz stated that she was walking toward Tito's Tacos on the night of August 8, 1999, when she saw her cousin, Miguelito (Miguel) Perez, and another cousin, Arturo, walking in an alley. Ms. Cruz yelled: "Miguelito," and he looked in her direction. As she approached Tito's Tacos, Ms. Cruz saw Miguel and Arturo come from behind Church's Chicken toward the victim. Arturo brought his hands up from his waistband and he fired two shots at the victim. Ms. Cruz ran away and told her sister that "they just shot [the victim]." To avoid getting into trouble with her mother for being out late near Tito's Tacos, Ms. Cruz and her sister made up a story that they had been together the whole night.

¶ 24   Ms. Cruz was now coming forward to make this statement because she feels "bad" that defendant is locked up for a crime he did not commit.

¶ 25                                 B. The Affidavits
¶ 26                                   1. Jevon Ollins
¶ 27   In his affidavit dated June 19, 2007, Jevon Ollins attested that he was inside Tito's Tacos at the time of the shooting and did not see the shooter. Mr. Ollins told the police he had not

seen the shooter, but they showed him a photographic array and pointed out defendant's photograph five or six times, thereby indicating to him that he was supposed to identify defendant.

¶ 28 Mr. Ollins did not want to testify, but he was scared because he had just gotten out of prison and the detectives threatened that they could make things "hard" for him. Mr. Ollins subsequently testified before the grand jury. Detective Rodriguez and another detective told him to testify that he saw defendant running after the shooting. Mr. Ollins testified accordingly, although his testimony was untrue.

¶ 29 The police also told Mr. Ollins to tell Ms. Thomas that they would "take care of" her pending court case if she testified against defendant. Mr. Ollins passed that information on to Ms. Thomas.

¶ 30 Ms. Thomas and Ms. Scott both told him they did not see the shooter and that they testified against defendant only because they were pressured to do so by the police.

¶ 31 Mr. Ollins has heard that the Ambrose gang put out a "hit" on the victim because "of something that happened between [the victim] and Willie Perez [an Ambrose member]."

### 2. Jonathan Meskauskas

¶ 33 In his affidavit, dated April 14, 2010, Jonathan Meskauskas attested that he was an Ambrose member in 1999. On August 7, 1999, he heard about an Ambrose party on 18th Street. When he arrived at 3 a.m., on August 8, he saw a lot of police activity. Two Ambrose members told him that another Ambrose had shot a La Raza member. Mr. Meskauskas subsequently learned that the Ambrose had ordered the shooting as retaliation for "something that a [La] Raza or somebody associated with [La Raza] had done to one of the older members of the Ambrose."

¶ 34 Eleven years later, Mr. Meskauskas and defendant were in prison together, and defendant asked him for help in proving his innocence. Mr. Meskauskas agreed because he was no longer an active member of the Ambrose and because he knew defendant was innocent.

### 3. Lynda Tricarico

¶ 36 In her affidavit dated July 24, 2012, Lynda Tricarico attested that she is a practicing attorney in New York and a former law student at Northwestern, where she participated in the April 2010 interview of Mr. Meskauskas. Ms. Tricarico heard Mr. Meskauskas reveal that, one week after the shooting, Ambrose member Miguel Perez bragged about shooting the victim. Mr. Meskauskas further revealed that the shooter was the nephew of an Ambrose "chief" and is currently confined to a wheelchair.

¶ 37 Mr. Meskauskas told Ms. Tricarico that he was willing to sign a statement indicating that the Ambrose gang was responsible for killing the victim, but that he did not want to "snitch" on Mr. Perez and publicly identify him as the shooter. Ms. Tricarico wrote out the statement of Mr. Meskauskas, which he signed, that reflected the details to which he was willing to testify.

### 4. Max Hernandez

¶ 39 In his affidavit dated April 11, 2013, Max Hernandez attested that, at about 2 a.m. on August 8, 1999, he was standing in front of a bar called Club Holiday on Blue Island

Avenue. He saw the victim walk to the nearby Tito's Tacos with "Lil Danny" and "Javy." Lil Danny and Javy went inside the restaurant while the victim remained outside. Less than two minutes later, Mr. Hernandez saw an Ambrose member named Miguelito "talking face to face" with the victim. Miguelito took a few steps back, pulled a gun from his waist, and shot the victim in the chest. Miguelito then ran toward Church's Chicken, while the victim ran toward 19th Street and collapsed on the curb.

¶ 40    Mr. Hernandez did not come forward earlier because he had been unaware that defendant had been charged with this crime until he moved back "into the neighborhood" around 2004-05.

¶ 41                              5. Erica Vargas

¶ 42    In her affidavit dated January 11, 2014, Erica Vargas attested that on the night of August 8, 1999, she was at her boyfriend's third-floor apartment located at 1840 S. Blue Island Avenue, across the street from Church's Chicken and just north of Tito's Tacos. She looked out the window and saw Miguelito coming from behind Church's Chicken, "creeping and crouching" so as not to be seen. She knew who Miguelito was because she "saw him all the time." She also knew defendant from seeing him around the neighborhood, and she would have recognized defendant "if that was him."

¶ 43    As Miguelito crossed Blue Island Avenue heading toward Tito's Tacos, Ms. Vargas lost sight of him because a bay window blocked her view. A few seconds later, she heard a gunshot, and then saw Miguelito "run full speed back towards Church's Chicken and Ambrose territory." The next day, she learned that the victim was the person who had been shot near Tito's Tacos the night before.

¶ 44    Ms. Vargas did not tell the victim's family, defendant, or anyone in La Raza about what she had seen. She remained silent because she had two younger brothers living in Ambrose territory and did not want them to get hurt. Also, about a week after the shooting, she was at her boyfriend's apartment, when someone fired a shot through his front window, landing above their bed. She interpreted this to be a threat from the Ambrose.

¶ 45    Ms. Vargas did not say anything about what she had seen until a baby shower on November 9, 2013, when she told the victim's mother that Miguelito was the shooter. In early January 2014, Ms. Vargas agreed to meet with defendant's attorney at her house, where she gave this statement. Ms. Vargas made the statement because "it's the right thing to do" and because the Ambrose are much less active in the neighborhood than they used to be.

¶ 46                     C. The Postconviction Court's Ruling

¶ 47    On July 1, 2014, the court dismissed defendant's postconviction claim of actual innocence at the second stage, finding that defendant had failed to make a substantial showing thereof.

¶ 48                  II. Ineffective Assistance of Trial Counsel

¶ 49    Defendant claimed that his trial counsel provided ineffective assistance for failing to call alibi witnesses. The court found that defendant had made a substantial showing of ineffective assistance, and advanced the claim to a third-stage evidentiary hearing. We proceed to set

forth the relevant testimony at the hearing.

## A. Alibi Witness Testimony

### 1. Daisy Garcia

Daisy Garcia testified that, in 1999, she was affiliated with La Raza. In the early morning of August 8, 1999, she was outside her house, located at 1901 S. Allport Street, with defendant, Jesus Salazar, Yesenia Martinez, and Reynaldo Martinez. Ms. Garcia and Mr. Salazar had been drinking alcohol earlier that day. Ms. Garcia heard a gunshot, and she and Mr. Salazar walked in the direction of the gunshot to investigate. At the crime scene, she learned that the victim had been shot.

Ms. Garcia spoke with a member of the defense team prior to trial, but she could not recall with whom she spoke, and she denied meeting with anyone from the defense team in person.

### 2. Yesenia Martinez

Yesenia Martinez testified that, on August 8, 1999, she was a member of La Raza. On that day, she met with defendant, Ruby Cervantes, and Reeboy in an alley on Cullerton and Loomis Streets, where they smoked PCP. Later, she went to 19th and Allport Streets, where she was with defendant, Daisy Garcia, Jesus Salazar, Richard Rocha, and a person nicknamed "Little Cat." Her brother, Reynaldo Martinez, arrived with his friend, Chacal, and argued with her that she should come home. The argument concluded when Mr. Martinez observed flashing emergency lights.

The group walked toward the lights and encountered a female who told them that the victim had been shot. Defendant appeared shocked by the news.

A few days later, Ms. Martinez gave a statement to police. The officers asked her to return for a polygraph test, but she did not do so. Prior to trial, she met with Investigator Richard English and told him that defendant was with her at the time of the shooting. Someone from defense counsel's office called her and told her they would let her know if they needed her to testify. They never called her back.

Ms. Martinez made a video-recorded statement on January 7, 2011, stating that defendant arrived at 19th and Allport Streets only *after* the victim was shot. Ms. Martinez testified that the video-recorded statement was false and that she made it because the State pressured her to do so.

### 3. Jesus Salazar

Jesus Salazar testified that, in 1999, he was a member of La Raza. On August 8, 1999, he was at 19th and Allport Streets with Yesenia Martinez, Reynaldo Martinez, Chacallo, "Ears," Little Cat, Daisy Garcia, and defendant.

Mr. Salazar heard a gunshot, and later learned that the victim had been shot. He spoke with police two or three days after the shooting, and they asked him to take a polygraph test the next day, but he did not return. The defense team never spoke to him, but he did attend the trial. At trial, a defense attorney told him he was not needed as a witness.

Mr. Salazar previously made a video-recorded statement on November 17, 2010, in which he stated that defendant was *not* with him when the victim was shot. Mr. Salazar

testified that the video-recorded statement was false and was the result of lengthy questioning by police. He also made the statement because he thought that if he cooperated, his pending criminal case would be favorably resolved.

¶ 63                            4. Reynaldo Martinez

¶ 64    Reynaldo Martinez testified that he was driving with his friend, Andrew Delgado, on the night the victim was shot. As they drove by 19th and Allport Streets, he observed his sister, Yesenia, with Jesus Salazar, Daisy Garcia, defendant, Little Cat, and Ears.

¶ 65    Mr. Martinez parked, and he approached his sister and told her she needed to go home. She refused, and they began arguing. The argument stopped when they observed emergency lights. Mr. Martinez never heard a gunshot.

¶ 66                       B. Non-Alibi Witness Testimony

¶ 67                            1. Marijane Placek

¶ 68    Assistant Public Defender (APD) Marijane Placek testified she was the lead trial attorney on defendant's case and worked with APD Ruth McBeth and Investigator Richard English. APD Placek spoke with defendant regarding his alibi. Defendant had initially told police he was with his aunt at the time of the shooting, and later said he was with his brothers. Defendant indicated to APD Placek, though, that neither of those alibis was true.

¶ 69    The victim's mother subsequently informed APD Placek of potential alibi witnesses. During the course of her investigation, APD Placek made two trips to speak with those witnesses and spoke with a male and a female, whose names she could not recall.

¶ 70    The female witness told APD Placek that, at the time of the shooting, she was with defendant and other persons under a viaduct and that defendant left the group and came back. APD Placek asked her why she did not go to the police, and she replied that she did not want to get involved.

¶ 71    APD Placek remembered that the male witness was a gang member and he stated that, at the time of the shooting, defendant was "outside of the viaduct." APD Placek testified that the statements of the male and female differed regarding "when and who [defendant] got there with, how [he] got there, that sort of thing."

¶ 72    Several other alibi witnesses showed up on the day of trial and were interviewed initially by APD McBeth, and then by APD Placek. APD Placek testified that she ultimately decided not to put on an alibi defense because the alibi witnesses were not consistent with each other. APD Placek noted that, if the defense called the alibi witnesses to testify that he was with them at the time of the shooting, the State would have been able to call rebuttal witnesses regarding defendant's initial (and admittedly false) alibis that at the time of the shooting he had been (1) with his aunt or (2) with his brothers. APD Placek concluded that defendant's multiple alibis and his unbelievable alibi witnesses "would just make the defense out to be a liar."

¶ 73    APD Placek also testified that, had she called the alibi witnesses at trial, the State would have brought out that they had criminal backgrounds, and that some of them had refused to return to the police station to take polygraph examinations, further damaging the defense case. APD Placek decided, as a matter of trial strategy, not to call these alibi witnesses to the stand, but to instead vigorously cross-examine the State's witnesses and to argue that the

witnesses had wrongly identified defendant and that the actual shooter was an Ambrose member who acted at the direction of the Ambrose chief, Willie Perez.

¶ 74 On redirect examination, APD Placek testified that another reason she decided not to call the alibi witnesses was because they placed defendant at a location near where the shooting occurred.

### 2. Ruth McBeth

¶ 76 APD Ruth McBeth testified that she was the second chair for defendant's case and met with APD Placek and Investigator English on nearly a daily basis to discuss the case. Prior to trial, APD McBeth filed an answer to discovery on behalf of defendant and made a handwritten amendment to the answer to include a potential alibi defense.

¶ 77 The defense team ultimately chose not to present an alibi defense because, they believed, the defense they presented was superior—that the victim's mother did not believe defendant killed her son, and that a member of the Ambrose gang, Willie Perez, directed someone other than defendant to shoot the victim.

¶ 78 On cross-examination, APD McBeth noted that, if an alibi defense was presented, the State could present rebuttal evidence showing the multiple prior alibis defendant had claimed in the police reports. APD McBeth also noted that the credibility of the alibi witnesses had been damaged by their failure to cooperate with police, by their drug use, and by Mr. Salazar's criminal record.

### 3. Joseph Runnion

¶ 80 Joseph Runnion testified that he was a law clerk with the office of the Cook County Public Defender at the time of defendant's case. He met with defendant three or four times without APD Placek. APD Placek gave him instructions on different ways to "shake" defendant from his alibi, but defendant was adamant that he was a few blocks away with some friends when the victim was shot.

### 4. Miriam Sierig

¶ 82 Miriam Sierig testified that she formerly worked for the Office of the State Appellate Defender. Defendant's case was assigned to her in 2003. In April 2003, she spoke with APD Placek over the phone and asked her why she did not call alibi witnesses. APD Placek explained that defendant's alibi put him only a couple of blocks away from the scene of the shooting and "she did not consider that a valuable alibi or an alibi at all because it put [defendant] essentially right there."

### III. The Postconviction Court's Ruling

¶ 84 On May 16, 2016, the court denied defendant's postconviction claim of ineffective assistance.

### IV. Defendant's Appeal

#### A. The Second-Stage Dismissal of Defendant's Actual Innocence Claim

¶ 87 Defendant claims that the court erroneously dismissed his postconviction claim of actual innocence.

¶ 88        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) provides a method by which a criminal defendant can assert that his conviction was the result of a substantial denial of his rights under the United States Constitution or Illinois Constitution or both. *People v. Petrenko*, 237 Ill. 2d 490, 495-96 (2010). A postconviction proceeding is not an appeal from the judgment of conviction, but rather is a collateral attack on the trial court proceedings. *Id.* at 499.

¶ 89        In noncapital cases, the Act provides for three stages. *People v. Carter*, 2017 IL App (1st) 151297, ¶ 125. Defendant's postconviction claim of actual innocence was dismissed at the second stage.

¶ 90        During the second stage, defendant bears the burden of making a substantial showing of a constitutional violation. *People v. Domagala*, 2013 IL 113688, ¶ 35. Evidentiary questions are not to be resolved at this stage. *Id.* As the supreme court stated in *People v. Coleman*, 183 Ill. 2d 366, 385 (1998):

> "At the dismissal stage of a post-conviction proceeding, all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true. The inquiry into whether a post-conviction petition contains sufficient allegations of constitutional deprivations does not require the circuit court to engage in any fact-finding or credibility determinations. The Act contemplates that such determinations will be made at the evidentiary stage, not the dismissal stage, of the litigation. Due to the elimination of all factual issues at the dismissal stage of the post-conviction proceeding, a motion to dismiss raises the sole issue of whether the petition being attacked is proper as a matter of law."

¶ 91        The court's dismissal of a postconviction petition at the second stage is reviewed *de novo*. *People v. Rivera*, 2016 IL App (1st) 132573, ¶ 19.

> "Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. [Citation.] New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. [Citation.] Material means the evidence is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative means the evidence adds to what the jury heard. [Citation.]" *People v. Coleman*, 2013 IL 113307, ¶ 96.

¶ 92        "We must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *People v. Sanders*, 2016 IL 118123, ¶ 47. The evidence must be considered together, and not in isolation. *People v. Gonzalez*, 2016 IL App (1st) 141660, ¶ 28.

¶ 93        Defendant argues that the unnotarized statements from Ms. Thomas and Ms. Cruz and the sworn affidavits of Mr. Ollins, Mr. Meskauskas, Ms. Tricarico, Mr. Hernandez, and Ms. Vargas were new, material, noncumulative evidence of his actual innocence that is so conclusive that it would probably change the result on retrial. Accordingly, defendant contends he made a substantial showing of his actual innocence such that we should reverse and remand for a third-stage evidentiary hearing.

¶ 94        Before we reach the merits of defendant's actual innocence claim, we must first consider which of the unnotarized statements and sworn affidavits attached to his petition are procedurally sufficient to be considered under the Act at the second stage, *i.e.*, which ones

are newly discovered, material, and noncumulative.

¶ 95                    1. The Unnotarized Statements of Ms. Thomas and Ms. Cruz

¶ 96    Initially, we note that the unnotarized statements of Ms. Thomas and Ms. Cruz were newly discovered, where Ms. Thomas did not come forward until after trial, in 2010, when she first told "the truth" to persons from Northwestern because her conscience was bothering her and she wanted to set the record straight, and where Ms. Cruz also did not come forward until November 2007 because her conscience was bothering her.

¶ 97    The statements of Ms. Thomas and Ms. Cruz were also material and noncumulative, where Ms. Thomas recanted her trial testimony implicating defendant and where Ms. Cruz identified someone other than defendant as the shooter.

¶ 98    The State argues, though, that because the statements of Ms. Thomas and Ms. Cruz are unnotarized, they are not affidavits. See *People v. Allen*, 2015 IL 113135, ¶ 31 ("An affidavit consists of a 'statement sworn to before a person who has authority under the law to administer oaths.' " (quoting *Roth v. Illinois Farmers Insurance Co.*, 202 Ill. 2d 490, 494 (2002))). An affidavit that is not sworn is a nullity. *Roth*, 202 Ill. 2d at 497. The State contends that as the statements of Ms. Thomas and Ms. Cruz are not affidavits, they run afoul of section 122-2 of the Act, which requires that the petition "shall have attached thereto *affidavits*, records, or other evidence supporting its allegations." (Emphasis added.) 725 ILCS 5/122-2 (West 2012).

¶ 99    The purpose of an evidentiary affidavit under section 122-2 is to (1) contain a factual basis to demonstrate that the petition's allegations are capable of objective corroboration and (2) " 'identify with reasonable certainty the sources, character, and availability of the alleged evidence supporting the petition's allegations.' " *Allen*, 2015 IL 113135, ¶ 32 (quoting *People v. Delton*, 227 Ill. 2d 247, 254 (2008)). As neither that statement of Ms. Thomas nor the statement of Ms. Cruz is an evidentiary affidavit, the State argues that they provide no corroboration of the petition's allegations or identify the sources, character, and availability of the alleged evidence supporting the petition's allegations and, therefore, they may not be considered at the second stage.

¶ 100   Defendant responds that under section 122-2, a postconviction petition need not have an affidavit attached as long as there is some "other evidence supporting its allegations." 725 ILCS 5/122-2 (West 2012). Defendant contends that the unnotarized statements from Ms. Thomas and Ms. Cruz constitute such "other evidence" (*id.*) and, therefore, they could properly be considered at the second-stage proceedings.

¶ 101   *Allen* is dispositive. In *Allen*, the defendant filed a *pro se* petition accompanied by an unnotarized statement from Robert Langford (Langford statement), indicating that its writer was responsible for the victim's murder and that the defendant had no involvement. *Allen*, 2015 IL 113135, ¶ 1. The circuit court dismissed the petition at the first stage as frivolous and patently without merit. *Id.* ¶¶ 1-2.

¶ 102   The supreme court reversed and remanded, holding that the defendant's failure to notarize did not make the petition frivolous or patently without merit. *Id.* ¶ 34. While the Langford statement was not an admissible affidavit in its present form, it properly qualified as " 'other evidence' " satisfying the evidentiary requirements of the first stage. *Id.*

¶ 103    However, the supreme court further stated that "[t]he defendant is not entirely absolved from the notarization requirement of *Roth*." *Id.* ¶ 35. The supreme court explained that where postconviction counsel is unable to remedy the lack of notarization of an attached statement, the State may "challenge this nonjurisdictional procedural defect at the second stage of proceedings" and the postconviction court may disregard the statement and dismiss the petition if it is not otherwise supported by a notarized affidavit. *Id.* The supreme court explained that "where postconviction counsel is unable to remedy the lack of notarization of an attached statement, dismissal at the second stage is appropriate—filtering out forgeries." *Id.* ¶ 38.

¶ 104    In the present case, the State brought a motion to dismiss, arguing that the unnotarized statements of Ms. Thomas and Ms. Cruz were not affidavits and, therefore, that they should not be considered. The State preserved the issue by correctly challenging the unnotarized statements at the second stage of proceedings (*id.*) and the postconviction court correctly found that, as appointed counsel had failed to arrange for notarization of the statements of Ms. Thomas and Ms. Cruz, neither of those statements were sufficient at the second stage to provide evidentiary support for defendant's petition. Accordingly, in addressing the second-stage dismissal of defendant's claim of actual innocence, we do not consider the unnotarized statements of Ms. Thomas and Ms. Cruz.

¶ 105    Defendant argues, however, that both Ms. Thomas and Ms. Cruz gave the statements while they were incarcerated, and no notary was present. Defendant contends that the lack of a notary excuses his failure to provide a notarized affidavit from Ms. Thomas and Ms. Cruz.

¶ 106    We disagree. Ms. Thomas made her statement on April 19, 2010. Ms. Cruz made her statement on November 30, 2007. Defendant has given us no indication what efforts, if any, counsel made to secure notarized statements from Ms. Thomas and Ms. Cruz in the almost 8 years since Ms. Thomas made her statement and in the more than 10 years since Ms. Cruz made her statement. See *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 36 (noting that where an incarcerated defendant's petition survives the first stage, "appointed counsel can arrange for the defendant to meet with a notary"). In the absence of any indication anywhere in the record that appointed counsel sought to obtain a properly notarized affidavit from Ms. Thomas and Ms. Cruz, their unnotarized statements were successfully challenged by the State at the second stage and will not be considered by us when reviewing the dismissal.

¶ 107                              2. The Affidavit of Mr. Ollins

¶ 108    We also disregard the affidavit of Mr. Ollins, as it was not newly discovered evidence. *Coleman*, 2013 IL 113307, ¶ 96. Mr. Ollins was at Tito's Tacos on the night of the shooting, spoke with the police in the aftermath, testified before the grand jury, and stated in his affidavit that he has "been waiting many years for someone to track me down and to talk with me about this case." Thus, Mr. Ollins could have been discovered earlier through due diligence and his statement could have been presented at trial. As the affidavit of Mr. Ollins was not newly discovered, we will not consider it when reviewing the dismissal.

¶ 109                      3. The Affidavits of Max Hernandez and Erica Vargas

¶ 110    The affidavits of both Max Hernandez and Erica Vargas were material and noncumulative, where Mr. Hernandez testified to seeing Miguelito Perez, an Ambrose member, shoot the victim, and where Ms. Vargas testified to seeing Miguelito Perez at the

- 12 -

scene and then saw him fleeing toward Ambrose territory after the shooting. They were also newly discovered, where Mr. Hernandez did not come forward until April 2013, after moving back into defendant's neighborhood and where Ms. Vargas did not come forward until January 2014, after the Ambrose became much less active in the neighborhood. Accordingly, the affidavits of Mr. Hernandez and Ms. Vargas may be considered by us on appeal.

¶ 111                    4. The Affidavits of Mr. Meskauskas and Ms. Tricarico

¶ 112     The affidavits of both Mr. Meskauskas and Ms. Tricarico were material and noncumulative, where Mr. Meskauskas attested that unnamed Ambrose members told him on the night of the shooting that the Ambrose had shot a La Raza member and where Ms. Tricarico attested to being present when Mr. Meskauskas made the statement that Miguel Perez, an Ambrose member, bragged about shooting the victim. Both were newly discovered, where Mr. Meskauskas did not come forward until April 2010, when he was no longer an active Ambrose member, to make his statement. Ms. Tricarico did not come forward until July 2012 to make her statement.

¶ 113     The State argues, though, that we should not consider the affidavits of Mr. Meskauskas and Ms. Tricarico because they consist of hearsay and double hearsay, respectively. The admissibility of hearsay is set forth in the Illinois Rules of Evidence.

¶ 114     Defendant makes no argument as to any specific hearsay exception applicable to the hearsay affidavits of Mr. Meskauskas and Ms. Tricarico. Instead, he argues that hearsay rules no longer apply to postconviction proceedings, and he cites in support Rule 1101(b)(3) of the Illinois Rules of Evidence, which was adopted by the supreme court and amended on April 8, 2013, to include "postconviction hearings" on the list of proceedings to which the rules of evidence (including the rules against hearsay) "do not apply." Ill. R. Evid. 1101(b)(3) (eff. Apr. 8, 2013).

¶ 115     When interpreting a rule adopted by the supreme court, we give effect to the drafter's intent, the most reliable indicator of which is the language used, which must be given its plain and ordinary meaning. See *People v. Tousignant*, 2014 IL 115329, ¶ 8; *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 129. At issue here is the supreme court's intent when it stated in Rule 1101(b)(3) that the rules of evidence do not apply in "postconviction hearings."

¶ 116     We note that postconviction hearings may be held at the second and third stages. At the second stage, the court may hold a dismissal hearing on the State's motion to dismiss. *People v. Hatchett*, 2015 IL App (1st) 130127, ¶ 27. At the third stage, the court holds an evidentiary hearing. *Id.* Rule 1101(b)(3) does not specify that the rules of evidence are inapplicable only during second-stage hearings, or only during third-stage hearings. Instead, Rule 1101(b)(3) provides that the rules of evidence are inapplicable to "postconviction hearings" generally and makes no distinction between second and third-stage hearings. In our view, the supreme court thereby clearly indicated that the rules of evidence are inapplicable at both types of hearings. See generally, *Gibson*, 2018 IL App (1st) 162177.

¶ 117     However, hearsay evidence may be treated differently at the second stage than at the third stage. At the second stage, the well-pleaded facts in the petition and accompanying affidavits, including any affidavits containing hearsay, which do not conflict with the record, are taken as true when determining whether a defendant has made a substantial showing of his innocence so as to advance the petition to a third-stage evidentiary hearing; no credibility

determinations are made. *People v. Gacho*, 2016 IL App (1st) 133492, ¶ 13; *Coleman*, 183 Ill. 2d at 385.

¶ 118    By contrast, if a petition advances to a third-stage evidentiary hearing, a defendant will "no longer enjoy[ ] the presumption that the allegations in his petition and accompanying affidavits are true." *Gacho*, 2016 IL App (1st) 133492, ¶ 13. Instead, as to a claim of actual innocence, the postconviction court at the third stage is to decide the weight to be given the testimony and evidence, make credibility determinations, and resolve any evidentiary conflicts. *People v. Carter*, 2013 IL App (2d) 110703, ¶ 74. In determining the weight to be given the new evidence and whether all the evidence, new and old, is so conclusive that it is more likely than not that no reasonable juror would find defendant guilty beyond a reasonable doubt on retrial, the court at the third stage must necessarily consider whether the new evidence would ultimately be admissible at a retrial. Thus, in this case, at the third stage, the hearsay affidavits of Mr. Meskauskas and Ms. Tricarico would be subjected to credibility, reliability, and weight-testing, and the court in making its determination would consider the possibility of their admissibility at a new trial.

¶ 119    In the present case, though, the court dismissed the petition after a second-stage hearing. The hearsay affidavits of Mr. Meskauskas and Ms. Tricarico were admissible under Rule 1101(b)(3) and must be taken as true, at this stage of the proceedings, when determining whether to advance the petition to a third-stage evidentiary hearing.

¶ 120    The State argues that, even if the hearsay affidavits are admissible at the second stage, petitions supported by affidavits containing only hearsay are generally insufficient to warrant a third-stage hearing. See *People v. Salgado*, 2016 IL App (1st) 133102, ¶ 47. However, in the present case, defendant's petition is supported not only by the hearsay affidavits of Mr. Meskauskas and Ms. Tricarico but, also, by the corroborative, nonhearsay affidavits of Max Hernandez and Erica Vargas, all of which we will now consider together in determining whether the court erred in dismissing defendant's petition.

¶ 121                    5. The Showing of Actual Innocence

¶ 122    Having determined what evidentiary support may be considered, we now address whether defendant's newly discovered, material, noncumulative evidence made a substantial showing of his actual innocence. As discussed earlier in this opinion, our supreme court has held that to make a substantial showing of actual innocence at the second stage of postconviction proceedings so as to advance to a third-stage evidentiary hearing, "[w]e must be able to find that petitioner's new evidence is so conclusive that it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *Sanders*, 2016 IL 118123, ¶ 47.

¶ 123    Defendant has made a substantial showing of actual innocence here, sufficient to advance the petition to a third-stage evidentiary hearing.

¶ 124    We begin our analysis by briefly reviewing the evidence at trial. Defendant and the victim were good friends. Defendant was a member of La Raza; the victim was not in a gang. Two witnesses, Ms. Scott and Ms. Thomas, testified to seeing defendant near Tito's Tacos on August 7. On the morning of August 8, they returned to Tito's Tacos and saw defendant shoot the victim. No one testified to the contrary.

- 14 -

¶ 125    The victim's mother testified that an Ambrose chief named Willie had earlier pressed charges against the victim for breaking his car windows and had yelled at her and the victim about this matter. During closing arguments, defense counsel argued that the Ambrose gang killed the victim on Willie's order. However, the jury convicted defendant based on the undisputed testimony of Ms. Scott and Ms. Thomas identifying defendant as the shooter.

¶ 126    The new testimony provided on postconviction, taken as true at the second stage (*id.* ¶ 48), and considered collectively (*Gonzalez*, 2016 IL App (1st) 141660, ¶ 28), would provide the evidence (lacking at trial) to support the defense theory. Specifically, Mr. Hernandez would testify that at about 2 a.m. on August 8, 1999, he was standing near a bar on Blue Island Avenue when he saw the victim walking to Tito's Tacos with two other persons, Danny and Javy. Danny and Javy went inside the bar while the victim remained outside. Less than two minutes later, Mr. Hernandez saw an Ambrose member, Miguelito, talking face to face with the victim, after which Miguelito pulled a gun from his waist and shot the victim in the chest. Mr. Hernandez then saw Miguelito run toward Church's Chicken, in Ambrose territory.

¶ 127    Ms. Vargas would testify that on the night of August 8, 1999, she was inside her boyfriend's apartment across the street from Church's Chicken when she looked out the window and saw Miguelito coming from behind Church's Chicken, creeping and crawling toward Tito's Tacos. Ms. Vargas momentarily lost sight of Miguelito, but then heard a gunshot and saw Miguelito running full speed towards Church's Chicken "and Ambrose territory." The next day, she learned that the victim had been shot near Tito's Tacos on August 8. Although Ms. Vargas did not witness the actual shooting, her testimony corroborates Mr. Hernandez's account of Miguelito's presence at the shooting, followed by his flight into Ambrose territory.

¶ 128    Mr. Meskauskas would testify that on August 8, 1999, two Ambrose members told him that an Ambrose had shot a La Raza member. He subsequently learned that the Ambrose gang had ordered the shooting in retaliation for something that a La Raza member or someone associated with La Raza had done to a member of the Ambrose.

¶ 129    Ms. Tricarico would testify that Mr. Meskauskas additionally stated that one week after the shooting, an Ambrose member, Miguel Perez, bragged about shooting the victim and that Mr. Perez was a nephew of an Ambrose chief.

¶ 130    The collective testimony of Mr. Hernandez, Ms. Vargas, Mr. Meskauskas, and Ms. Tricarico, taken as true, considered together with the testimony of the victim's mother, would support the defense theory of the case that an Ambrose chief ordered the victim's shooting in retaliation for breaking his car windows and that Miguelito Perez carried out the order, shot the victim, and ran back to safety in Ambrose territory. The defense theory, with the new supporting evidence taken as true at the second stage, calls into question the State's theory that the victim's good friend (defendant, a La Raza gang member) shot the victim for no apparent reason and then ran into the territory of an enemy gang (Ambrose). We also note that there was no physical evidence tying defendant to the crime, the gun was not recovered, and the witnesses who testified against him had criminal backgrounds of their own.

¶ 131    Taking the well-pleaded allegations of defendant's postconviction petition and his supporting affidavits as true, as we must at the second stage of proceedings (*Gacho*, 2016 IL App (1st) 133492, ¶ 13), we find that defendant has met his burden of showing that it is more

- 15 -

likely than not that no reasonable juror would find him guilty after considering his new evidence.

¶ 132     We reiterate that we are not making any credibility determinations regarding the testimony of Mr. Hernandez, Ms. Vargas, Mr. Meskauskas, or Ms. Tricarico, and we are not determining which of their testimony would be admissible at retrial; rather, we are finding that defendant's well-pleaded allegations and supporting affidavits, taken as true at the second stage, are sufficient to make a substantial showing of his actual innocence and to advance the proceedings to the third stage. Accordingly, we reverse the second-stage dismissal of defendant's postconviction petition and remand for a third-stage hearing at which the witnesses in support of defendant's actual innocence claim will testify, credibility determinations will be made, and the court can determine which evidence is admissible at retrial and whether such evidence entitles defendant to relief. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 133     Defendant asks that we remove the postconviction judge from the case and assign the case to a different judge on remand. Defendant cites in support *People v. Serrano*, 2016 IL App (1st) 133493. In *Serrano*, the postconviction court granted a directed finding for the State after the close of petitioner's case at a third-stage evidentiary hearing. *Id.* ¶ 23. We reversed and remanded to a different judge, noting:

> "Petitioner offered up an abundance of evidence to support his claim of actual innocence. The trial court turned a blind eye to much of the evidence and also refused to admit probative, admissible evidence that, when evaluated under the proper standard, is damning. Even where the court gave lip service to the standard it was supposed to apply, the court clearly did not adhere to that standard. The postconviction court gave the impression that it was flatly unwilling to consider the evidence offered by petitioner. [Citation.] Petitioner would be prejudiced were we not to assign the case to a new judge on remand." *Id.* ¶ 45.

¶ 134     Unlike in *Serrano*, where the postconviction judge clearly indicated his unwillingness to impartially consider petitioner's evidence of actual innocence, the postconviction judge here has not similarly indicated in any way that he prejudged the evidence or failed to evaluate it fairly. The record shows thoughtful consideration of the issues. We find no cause to assign the case to a new judge on remand.

¶ 135          B. The Third-Stage Denial of Defendant's Ineffective Assistance Claim

¶ 136     Defendant contends the postconviction court erroneously denied his claim of ineffective assistance of trial counsel, following the third-stage hearing.

¶ 137     When a petition is advanced to the third-stage evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse the court's decision unless it is manifestly erroneous. *Carter*, 2017 IL App (1st) 151297, ¶ 132. If no fact-finding or credibility determinations were necessary at the third stage, and the issues presented were all pure questions of law, we apply a *de novo* standard of review. *Id.* Typically, review of a claim of ineffective assistance of counsel involves a mixed question of law and fact. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55. When addressing such a claim, we defer to the court's findings of fact and will disturb them only if they are against the manifest weight of the evidence, but we review *de novo* the court's ultimate determination of whether counsel rendered ineffective assistance. *Id.*

¶ 138    To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Defendant must show, first, that "counsel's representation fell below an objective standard of reasonableness" (*id.* at 688) and, second, that he was prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*id.* at 694).

¶ 139    Defendant first argues on appeal that his lead trial counsel, APD Placek, rendered ineffective assistance by failing to present the defense she promised in her opening statement. Specifically, during her opening statement, counsel stated that "[w]hen you listen to their witnesses and when you listen to who testifies for which side, I believe you will find out the truth of this matter, that in fact [defendant] neither had motive, neither had *opportunity*, nor did he wish in any way to harm his friend." (Emphasis added.) Defendant contends that the use of the word "opportunity" created a promise to the jury that it would hear alibi evidence, which was subsequently broken when such evidence was never presented. However, defendant failed to raise this claim in his original or amended postconviction petition, and therefore it is waived. See 725 ILCS 5/122-3 (West 2012) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived.").

¶ 140    Defendant next argues that his trial counsel (APD Placek and cocounsel, APD McBeth) provided ineffective assistance by failing to properly investigate and call the alibi witnesses at trial. Defendant contends that when investigating the proposed alibi, his trial counsel operated under a genuine misunderstanding of the actual alibi location, wrongly believing that the alibi placed defendant at Cullerton and Loomis Streets, close to the scene of the shooting; in actuality, though, defendant's alibi witnesses placed him at 19th and Allport Streets, which was farther away from the shooting location. Defendant argues that trial counsel premised their decisions about whether to present the alibi on this mistake of fact, which constituted ineffective assistance.

¶ 141    Defendant argues that APD Placek further demonstrated her ineffectiveness when, during her testimony at the evidentiary hearing, she misremembered details of her alleged investigation into his alibi. Defendant contends that her testimony is so suspect and incredible that it should not have been believed and that she should have been found to have rendered ineffective assistance by failing to properly investigate his alibi.

¶ 142    The postconviction court considered defendant's arguments regarding APD Placek's credibility, but found that she had given credible testimony regarding meeting with potential alibi witnesses and with speaking to defendant about his alibi. The court also noted that Investigator English had met with multiple alibi witnesses and that counsel's law clerk had spoken with defendant about his alibi. The court found that APD Placek and APD McBeth gave credible testimony that they decided not to put on the alibi witnesses because (1) the witnesses' accounts were inconsistent, and likely would have been found incredible by the jury due to their drug use, criminal record, and failure to speak with police as promised and take a polygraph examination, and (2) defendant had given multiple other false alibis that could be brought out by the State. The court expressly found the testimony of the alibi witnesses incredible, where (1) Mr. Salazar and Ms. Martinez had given prior statements inconsistent with their testimony, (2) the various witnesses testified inconsistently with each other regarding which persons were in front of Ms. Garcia's house at the time of the shooting, (3) the witnesses differed on how long defendant was with them prior to the

- 17 -

shooting, (4) some of the witnesses shared the same gang affiliation as defendant and had maintained contact with him since his incarceration, and (5) some of the witnesses had consumed drugs and/or alcohol around the time of the shooting that may have impaired their recollection of events.

¶ 143 Given its finding that defendant's trial counsel had made a credible claim of investigating the alibi witnesses and determining, as a matter of trial strategy, not to call them at trial, the court found that their performance was not objectively unreasonable. The court's credibility determinations were not manifestly erroneous, and they support the court's finding that counsel's investigation of the alibi witnesses was adequate and that their decision not to call them was a matter of trial strategy. *People v. Smith*, 195 Ill. 2d 179, 188 (2000) (matters of trial strategy are generally immune from claims of ineffective assistance of counsel).

¶ 144 Also, there can be no finding of ineffective assistance unless defendant shows that he was prejudiced by his counsel's alleged failure to investigate and call the alibi witnesses such that there is a reasonable probability that the result of the trial would have been different had the witnesses testified. *Strickland*, 466 U.S. at 694.

¶ 145 The postconviction court expressly found that no such prejudice occurred here. The court noted that the presentation of the alibi witnesses would have allowed the State to introduce police reports showing defendant's multiple prior (false) alibis, in which he stated he was with persons other than the alibi witnesses who would have testified at trial. The court next noted that the alibi witnesses' accounts lacked credibility due to their gang affiliations with defendant, their drug and alcohol use, and the discrepancies in their accounts regarding who was present with defendant at the time of the shooting, how long he was with the group, and which members of the group investigated the shooting. The court also noted that Ms. Martinez and Mr. Salazar faced impeachment for failing to speak to police as they promised or take a polygraph examination and that the location of the alibi was relatively close to the scene of the shooting. The court concluded that, "[b]ased on the totality of the circumstances, it is unlikely that any of the alibi witnesses would have testified credibly and, if anything, posed a serious risk of damaging petitioner's case. Petitioner fails to establish that [defense counsel's] decision not to present an alibi defense prejudiced the outcome of his case."

¶ 146 The court's findings of fact and credibility determinations were not manifestly erroneous, and they support the court's determination that counsel's alleged failure to properly investigate and present the alibi witnesses did not prejudice defendant, as there is no reasonable probability that the result of the trial would have been different had the witnesses testified. Accordingly, we affirm the third-stage denial of defendant's postconviction claim of ineffective assistance.

¶ 147 Before concluding, we note that a footnote in the appellant's brief cursorily states that his defense counsel was also ineffective for losing his trial file, thereby hindering his ability to determine whether they adequately investigated his alibi defense. Defendant's footnote on this issue, which is lacking in argument and citation to authority, fails to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Nov. 1, 2017). Further, defendant waived review by failing to raise the issue in his original or amended postconviction petition. See 725 ILCS 5/122-3 (West 2012).

## V. CONCLUSION

For the foregoing reasons, we reverse the second-stage dismissal of defendant's postconviction claim of actual innocence and remand for a third-stage evidentiary hearing thereon. We affirm the third-stage denial of defendant's postconviction claim of ineffective assistance.

Affirmed in part, reversed in part, and remanded.