2022 IL App (1st) 201066-U

No. 1-20-1066

Second Division
March 29, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | No. 04 CR 4297 |
| v. | ) | |
| | ) | |
| MICHAEL EDGLESTON, | ) | Honorable |
| | ) | Thaddeus L. Wilson |
| Defendant-Appellee, | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: The postconviction court's order granting defendant a new trial after a third-stage evidentiary hearing is affirmed where defendant established that he received ineffective assistance from trial and appellate counsels.

¶ 2    Following a 2007 jury trial, defendant Michael Edgleston was convicted of three counts of felony murder and sentenced to natural life in prison. He later filed a petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/121-1 *et seq.* (West 2012)) raising

various claims, including that his appellate counsel was ineffective for (1) failing to challenge the trial court's ruling allowing inadmissible hearsay evidence and (2) failing to argue that his trial counsel was ineffective for opening the door to such evidence. The petition ultimately advanced to a third-stage evidentiary hearing, after which the postconviction court granted defendant a new trial. The State now appeals that order, and we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      In October 2007, defendant was tried by a jury on six counts of felony first-degree murder in connection with the death of three brothers, Rashawn, Vashawn, and Vincent Austin. The following evidence was adduced at trial.

¶ 5      Chicago police officer Giovanni Crespo testified that around 7:30 p.m. on December 9, 2003, he responded to a call of shots fired at 1440 West 13th Street, which was one of the high-rise buildings of the Alba Homes public housing complex. He found three gunshot victims lying on the lobby floor, but they did not give the police any information about who shot them. Officers also sought information on the shooting from the crowd that began to gather in the lobby, but they did not receive anything useful from them either.

¶ 6      The State's next witness was Chicago police detective John Climack. Prior to Climack's testimony, the State requested clarification as to what evidence from the course of the investigation would be admissible. Specifically, the State sought permission to ask questions indicating that, before defendant was arrested and charged, several witnesses who would not be testifying were interviewed and shown a photo array that included defendant's photograph. The defense objected, arguing that the State's proposed line of questioning would amount to informing the jury that the non-testifying witnesses had identified defendant. The trial court agreed with the defense and therefore ruled that the State could not pursue that line of questioning on direct examination.

However, the court also ruled that the State could open the door for those questions on redirect examination if the defense's questioning implied "malfeasants [*sic*] of the detectives," which the court also described as implications that "the police did not properly investigate this case and there was no evidence." Defense counsel asked the court for further clarification on the meaning of "malfeasants [*sic*]," and the judge responded, "I can't give you more clarification. I don't know how it's going to run. You can ask for a sidebar and we can address it."

¶ 7     Climack then testified that he was assigned to investigate the Austin brothers' deaths. He went to the crime scene but was unable to find any witnesses. In December 2003, Climack was notified that there was a woman in police custody on another matter who might have information about the shooting. He interviewed the woman and determined that she was not an eyewitness. However, that interview led Climack to interview a woman named Helena Freeman, which in turn led him to interview Lola Baggett, Bohannon Walker, and Terry West. After these interviews, Climack issued an arrest warrant for defendant.

¶ 8     Defendant was subsequently arrested in January 2004 and brought to the police station for questioning. Detective Roger Sandoval testified that he and another detective, Gene Slater, initially interviewed defendant for about 15 minutes starting around 8 p.m. on the night of his arrest. Sandoval had another conversation with defendant around midnight. According to Sandoval, defendant admitted during this second conversation that he went to the Alba Homes building on the night of the shooting with the intention to rob people in the lobby. Defendant wore a bulletproof vest and was armed with a .40-caiber handgun. Upon entering the building, defendant saw Rashawn, whom he knew, selling drugs. Defendant asked Rashawn if he was armed, and Rashawn replied that he was not. Defendant then demanded Rashawn's money, and Rashawn handed over approximately $100 and a couple bags of crack cocaine.

¶ 9 Around that time, Vashawn and Vincent entered the lobby. Rashawn asked Vashawn if he was armed. Vashawn said "yes" and lifted his jacket to reveal a handgun tucked in his waistband. Vincent asked defendant to return Rashawn's money, but he refused. At some point, Vincent put his hand in his pocket and defendant shot Vincent because he believed he was reaching for a gun. Rashawn and Vashawn tried to run away, but defendant shot them both as well. Defendant then ran out of the building and called someone to pick him up. He later sold his gun in a different neighborhood so that it would not be traced back to him.

¶ 10 After defendant's confession, Sandoval called the State's Attorney's Felony Review Unit and Assistant State's Attorney Ted Lagerwall arrived to interview defendant. According to Sandoval, defendant made essentially the same confession to Lagerwall. Defendant also explained that he and the Austin brothers were members of the New Breeds gang and that the gang had a rule that its members were to be armed when selling drugs. Thus, defendant had a right to take Rashawn's money because he was caught selling drugs without a gun.

¶ 11 Sandoval further testified that Assistant State's Attorney James Papa interviewed defendant the next day. Defendant again relayed essentially the same story he told to Sandoval and Lagerwall. Papa informed defendant that there were a few options for memorializing his account, including a handwritten statement or video recording. However, defendant elected to have his confession remain an oral statement.

¶ 12 On cross-examination, Sandoval was asked about, *inter alia*, the approval of charges against defendant. Specifically, defense counsel confirmed with Sandoval that (1) it was the role of Felony Review to assess a case and decide whether to approve charges, (2) Lagerwall interviewed defendant and reviewed "documents relevant to this case that were available", and (3) Lagerwall did not approve charges after receiving defendant's confession. When asked whether

Lagerwall instructed him to continue the investigation, Sandoval replied that they "agreed upon that we continue it" because it was "not complete at that time." Similarly, defense counsel also confirmed that Papa reviewed the available documents and interviewed defendant, but did not approve charges. Finally, defense counsel asked Sandoval whether he took any photographs of defendant while he was at the police station in the days following his arrest. Sandoval answered, "I don't believe any pictures were taken."

¶ 13    Before redirect examination, the State asserted at a sidebar that defense counsel's repeated questions about charges not being approved after defendant's interviews suggested that there was "something wrong" with the confession. Thus, the State argued that it should be allowed to elicit that the investigation was only continued at the time so that the non-testifying witnesses could be shown a physical lineup involving defendant. The State further argued that it should also be allowed to introduce a photograph of defendant in that lineup, the existence of which Sandoval was forced to deny on cross-examination in order to comply with the court's ruling on a motion *in limine* barring the photograph.

¶ 14    The defense objected, arguing that the lineup evidence would improperly bolster the State's case by suggesting that non-testifying witnesses identified defendant in violation of his right to confront witnesses against him.

¶ 15    The court allowed the State to ask additional questions about the investigation, reasoning that the defense had "opened the door to some extent" by implying that charges were not approved because there was something suspicious about defendant's purported confession. Thus, the court allowed the State to "inquire about what has gone on in the investigation in the meantime" and to introduce the lineup photograph. However, the court also ruled that the State was still barred from

introducing evidence that witnesses were shown a photo array that included defendant prior to his arrest.

¶ 16    The State then asked Sandoval on redirect examination whether a lineup was conducted and whether charges were approved later that day. Sandoval answered "Yes." to each question and the lineup photo was admitted into evidence.

¶ 17    Papa testified consistently with Sandoval. Essentially, Papa stated that defendant admitted that (1) he took Rashawn's drugs and money pursuant to the New Breeds' policy against selling drugs unarmed and (2) he realized that he would need to shoot the Austin brothers once they demanded he return the drugs and money.

¶ 18    The State also asked Papa why he did not approve charges against defendant following his confession, and the defense objected on relevance grounds. In response, the State argued at the ensuing sidebar that the defense had opened the door to the issue in its cross-examination of Sandoval. The court overruled the defense's objection, but gave a limiting instruction to the jury that Papa's answer:

> "would be [hearsay] and therefore not reliable and it should not be considered for the truth of the matter asserted. It should be considered as to the course of the investigation and for the limited purpose of the steps that the police and the state's attorneys took in the course of the investigation."

Papa then answered that he did not immediately approve charges because "line-ups still needed to be done with a couple of other witness." The lineups were conducted the next day and, that same day, charges were approved "following the line-ups and the results of those line-ups[.]"

¶ 19    The State rested and the defense moved for a directed verdict, which was denied. The defense then rested without presenting testimony from defendant or any other witnesses. The jury

returned a guilty verdict on three counts of felony murder and defendant was sentenced to life in prison.

¶ 20    Defendant next filed a direct appeal, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the State made improper remarks during closing argument, and (3) the trial court erred by refusing to allow defense counsel to question the venire about the credibility of prosecutors. *People v. Edgleston*, 2011 IL App (1st) 090964-U. We affirmed defendant's convictions. *Id.*

¶ 21    Thereafter, defendant filed a *pro se* postconviction petition raising claims for ineffective assistance of counsel, including the argument that appellate counsel was ineffective for failing to challenge the trial court's decision to allow evidence that the non-testifying witnesses viewed him in a lineup. The trial court summarily dismissed the petition at the first stage, stating that defendant failed to overcome the presumption that his counsel's actions were the product of a sound strategy.

¶ 22    We reversed, reasoning in part that it was as least arguable that the defense either did not open the door to the implied identification evidence or that "the curative evidence went beyond its protective purpose and significantly bolstered the State's case because the State was able to imply that witnesses had identified defendant." *Edgleston*, 2016 IL App (1st) 142008-U, ¶ 34.

¶ 23    Similarly, we went on to find that defendant had also presented an arguable claim that appellate counsel was ineffective for failing to argue trial counsel's ineffectiveness on direct appeal. *Id.* ¶ 36. In so concluding, we stated that "[i]t is apparent from the record that prejudicial evidence was admitted as a result of trial counsel opening the door," even though the defense had been warned that its questioning might open the door to such evidence. *Id.* We further stated that it was "uncertain what the results of trial would have been had [the lineup evidence] not been

admitted because the only other evidence against defendant was his oral confession." *Id.* We therefore remanded defendant's petition for further postconviction proceedings.

¶ 24 On remand, counsel was appointed and filed an amended postconviction petition alleging, as relevant here, that trial counsel was ineffective for opening the door to the identification evidence through questioning on cross-examination. The amended petition also alleged that appellate counsel was ineffective for failing to include a claim of ineffective assistance of trial counsel on direct appeal.

¶ 25 The amended petition advanced to a third-stage evidentiary hearing, which was held on February 19, 2020. At the hearing, LaFarrell Moffett, defendant's lead trial counsel, acknowledged that he objected to allowing the "implied identification" evidence at trial on the grounds that the jury would likely infer that the non-testifying witnesses identified defendant as the perpetrator. Moffett also testified that he was "aware there was a threat of opening the door hanging over the litigation," and that "opening the door would be a bad thing if it let in otherwise-inadmissible evidence" because the State did not have any other evidence to corroborate defendant's oral confession.

¶ 26 When asked about the trial court's warning that the defense might open the door on cross-examination, Moffett answered, "It was my understanding that the judge made a ruling subject to allegations of malfeasance, which were described and determined." However, Moffett stated that he believed his cross-examinations did not suggest malfeasance. Rather, he testified that he "wanted the jury to know the course of conduct of the investigation and the ultimate interrogation of Mr. Edgleston which produced what we believed was zero, and not the three oral statements that were admitted into evidence." While Moffett agreed that the jury could have inferred from his questions that the police did not have sufficient evidence to charge defendant after his interviews,

Moffett stated that such an inference was speculative and not the intent of his questioning. Instead, Moffett asked questions "relative to the course of investigation" in order to "put an adequate timeframe around Mr. Edgleston's alleged interrogation" and "put the situation in a position where impeachment might be possible later given the testimony."

¶ 27    Jessica Arizo, defendant's appellate counsel, testified that she recalled having a meeting with her supervisor to decide what issues would be raised on direct appeal. Arizo did not specifically recall communicating with defendant, but stated that she "most likely did" based on her typical practice in working on an appeal. Arizo further testified that she and her supervisor determined that trial counsel had opened the door to the lineup evidence, and Arizo agreed that the jury could have inferred from such evidence that the nontestifying witnesses had identified defendant. However, Arizo also stated that she did not recall considering whether there was a viable claim for ineffective assistance of counsel, though she agreed in her testimony that a such claim "could have been raised" on direct appeal because the necessary information was contained in the trial record. Finally, Arizo recalled that a limiting instruction was given in regard to the lineup evidence, but she did not recall analyzing whether that instruction was sufficient to cure any possible error.

¶ 28    On August 25, 2020, the postconviction court issued a written order vacating defendant's conviction and granting a new trial. The postconviction court found that there was a reasonable probability that this court would have reversed defendant's conviction on direct appeal had appellate counsel argued that the trial court erred in allowing the State to introduce the implied identification testimony under the doctrine of curative admissibility. Specifically, the court stated that trial counsel's questioning on cross-examination did not require curative evidence, as "[m]erely because defense questioning may imply a statement was fabricated does not permit the

State to introduce unrelated and otherwise inadmissible incriminating evidence against the defendant." Thus, the circuit court concluded that the trial court was "patently wrong" in ruling that trial counsel had opened the door to the implied identification evidence and that the error was "clear from the record." Accordingly, appellate counsel was unreasonable for failing to raise the issue on direct appeal.

¶ 29    The State filed a timely notice of appeal.

¶ 30                                    II. ANALYSIS

¶ 31    The Act provides a three-stage method by which a criminal defendant may assert his conviction was the result of a substantial denial of one or more constitutional rights. 725 ILCS 5/122-1 *et seq.* (West 2016). At the first stage, the postconviction court takes all well-pleaded factual allegations in the defendant's petition as true, and must advance the petition to the second stage so long as the court finds that it stated the "gist" of a constitutional claim. *People v. Johnson*, 2021 IL 125738, ¶¶ 25-26. If the petition advances to the second stage, counsel is appointed to make any necessary amendments to the petition. *Id.* ¶ 27. The postconviction court again takes all well-pleaded factual allegations as true at this stage, and advances the petition to the third stage if the court finds that the defendant has made a substantial showing of a constitutional violation. *Id.*

¶ 32    At the third stage of postconviction proceedings, the postconviction court conducts an evidentiary hearing and decides whether to grant the defendant postconviction relief. In a case where the postconviction court must make fact-finding and credibility determinations after the evidentiary hearing, the court's decision will generally not be reversed on appeal unless it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. However, a reviewing court applies a *de novo* standard of review where (1) credibility and fact-finding determinations are unnecessary, such as where the issues are pure questions of law, and (2) the postconviction judge did not preside

over the trial proceedings and has no special familiarity with the proceedings. *Id.* Where, as here, the defendant raises claim of ineffective assistance of counsel, the case typically involves mixed questions of law and fact. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137. In such an instance, we defer to the court's factual findings unless they are against the manifest weight of the evidence, but review the ultimate determination of whether counsel rendered ineffective assistance *de novo*. *Id. De novo* review means that we perform the same analysis as the postconviction judge. *People v. Jackson*, 2021 IL App (1st) 190263, ¶ 38. As we owe no deference to the postconviction judge's reasoning, we may affirm on any basis found in the record. *Id.*

¶ 33    At issue in this case is whether defendant received ineffective assistance from either his trial or appellate counsels. Claims of ineffective assistance are governed by the familiar two-prong test set forth *in Strickland v. Washington*, 466 U.S. 668 (1984). *Velasco*, 2018 IL App (1st) 161683, ¶ 138. Under this test, a defendant must first show that his counsel's performance fell below an objective standard of reasonableness. *Id.* Second, the defendant must establish prejudice by showing that there is a reasonable probability that the result of the proceeding would have been different but for his counsel's deficient performance. *Id.*

¶ 34    In the present case, defendant's amended postconviction petition raised several theories as to why he was entitled to a new trial. The circuit ultimately granted defendant postconviction relief based not on a theory of ineffective assistance of counsel, but on the theory that the trial court erred when it ruled trial counsel had opened the door to the implied identification evidence. Correspondingly, the State on appeal argues that trial counsel did in fact open the door on cross-examination such that the trial court was correct in allowing the prosecution to admit the lineup evidence under the doctrine of curative admissibility. The State also contends that the question of whether trial counsel opened the door to such evidence is no longer at issue, as this court stated in

reversing the summary dismissal of defendant's petition that: "It is apparent from the record that prejudicial evidence was admitted as a result of trial counsel opening the door." *Edgelston*, 2016 IL App (1st) 142008-U, ¶ 36.

¶ 35 We agree with the State that trial counsel opened the door to the implied identification evidence. Although the postconviction court found that trial counsel's questioning was merely an attempt to "nail down details in the timeline of the investigation," our review of the record reveals that the questions asked on cross-examination went well beyond what was necessary to establish a timeline. Instead, the clear tenor of counsel's numerous questions about the approval of charges was to suggest that defendant was not immediately charged because there was something insufficient about his supposed confession. This was precisely the kind of implication that trial counsel was warned would open the door to the implied identification evidence. Although trial counsel was of course free to advance the defense's theory that defendant had not actually confessed, we cannot say that it was a reasonable strategy for counsel to do so in a way that opened the door for the State to introduce otherwise inadmissible incriminating evidence. Thus, we find that counsel's performance was objectively deficient in this regard.

¶ 36 We also find that defendant suffered prejudice from trial counsel's performance. As previously noted, a defendant shows prejudice in this context by establishing that there is a reasonable probability that the result of his trial would have been different but for counsel's deficiency. *Velasco*, 2018 IL App (1st) 161683, ¶ 138. A "reasonable probability" means a probability sufficient to undermine confidence in the outcome of the proceeding or, in other words, that counsel's performance rendered the result unreliable or fundamentally unfair. *People v. Little*, 2021 IL App (1st) 191108, ¶ 17.

¶ 37    As we observed in our previous order in this case, defendant's confession was essentially the State's only evidence. *Edgleston*, 2016 IL App (1st) 142008-U, ¶ 36. There was no eyewitness testimony or forensic evidence whatsoever connecting defendant to the murders. Moreover, the confession was oral and not memorialized in any way. Defendant did not testify, and it was the defense's theory that defendant did not actually confess. Under these circumstances, evidence implying that multiple other witnesses identified defendant in a lineup was crucial corroboration for the State's case. Indeed, Moffett himself acknowledged in his evidentiary hearing testimony that allowing the identification evidence would be detrimental to the defense because it was the only thing corroborating defendant's confession. Although the State downplays the seriousness of this evidence, we find the implication to be clear from the record: defendant was not charged after his confession, but was charged almost immediately after witnesses viewed him in a lineup. Thus, there was a profound risk that the jury would infer that defendant was identified in those lineups.

¶ 38    In light of this significant danger, we cannot agree with the State's position that the trial court's limiting instruction cured any potential prejudice. To be sure, a proper limiting instruction is generally sufficient to cure prejudice, as juries are presumed to follow a trial court's instructions. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 75. However, "[w]here a limiting instruction does not effectively protect the accused against the prejudicial effect of admitting evidence, prejudicial error results." *People v. Walljasper*, 97 Ill. App. 3d 81, 84 (1981). We find this to be one of those cases. The lineup evidence became one of the major issues at trial and, once ultimately admitted, constituted a substantial portion of the State's evidence against defendant. Moreover, the jury was informed that defendant was charged not merely following the lineups, but "following the line-ups and the results of those line-ups." Additionally, one of the few pieces of physical evidence shown to the jury was a photograph of defendant at the lineup. Under such circumstances, we are not

persuaded that a single admonishment to consider the lineup evidence only to explain the course of the investigation was sufficient. Fundamentally, trial counsel allowed the State to introduce otherwise inadmissible evidence that provided vital corroboration in what was a relatively weak case. Under such circumstances, we conclude that defendant was prejudiced.

¶ 39    Because both prongs of the *Strickland* test were satisfied, we find that defendant has made a substantial showing of ineffective assistance of trial counsel. Similarly, we also find that defendant has established a case of ineffective assistance of appellate counsel for failing to assert trial counsel's ineffectiveness on direct appeal. The State's contention that appellate counsel decided to forgo the argument based on strategic considerations is undermined by the record. For example, appellate counsel testified at the evidentiary hearing that she had determined that trial counsel had opened the door to the prejudicial lineup evidence. Moreover, appellate counsel agreed that the information necessary to raise trial counsel's ineffectiveness was contained in the trial record. However, appellate counsel could not recall analyzing whether the prejudice was cured by the limiting instruction, or even considering whether to bring a claim of ineffective assistance at all.  Had appellate counsel included such an argument, we find that there is a reasonable probability that defendant's direct appeal would have been successful. Accordingly, the postconviction court's decision to grant defendant a new trial is affirmed.

¶ 40                                III. CONCLUSION

¶ 41    Affirmed.