2025 IL App (1st) 231673-U

Order filed: August 14, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1673

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 11 CR 851 |
| GORDON GRANDBERRY, | ) ) | Honorable Erica Reddick, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Third-stage denial of postconviction petition is affirmed, where defendant failed to show that his trial and appellate counsels' performances amounted to ineffective assistance.

¶ 2    After a bench trial, defendant Gordon Grandberry was convicted of attempting to disarm a peace officer and resisting and causing injury to a peace officer and sentenced to concurrent terms of 13 years' imprisonment. Defendant subsequently filed a petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). A supplemental petition alleging ineffective assistance of trial and appellate counsels was denied by the postconviction court after

a third-stage evidentiary hearing. Defendant appeals from the denial of the supplemental petition only as to his conviction for attempted disarming of a peace officer and argues that the evidence established that his trial counsel was ineffective by fronting eight inadmissible prior convictions during defendant's direct examination and failing to object to inadmissible gang evidence and appellate counsel was ineffective by failing to raise these claims of ineffective assistance on direct appeal. For the following reasons, we affirm.

¶ 3    The facts leading up to defendant's convictions and sentence are set forth in detail in this court's decision in *People v. Grandberry*, 2013 IL App (1st) 112883-U. We repeat those facts which are relevant to this appeal.

¶ 4    In August 2011, at his bench trial, defendant was tried on three counts of aggravated battery to a peace officer, two counts of attempting to disarm a peace officer, and one count of resisting or obstructing a peace officer causing injury to that officer.

¶ 5    Chicago Police Department (CPD) Officer Mark Hernandez testified that on December 29, 2010, at approximately 11:40 a.m., he and his partner, CPD Officer Joy McClain, were on patrol and driving in an unmarked grey police vehicle. Both officers wore bulletproof vests over plain clothes with their badges and name tags displayed. As the officers drove south on Wentworth Avenue, Hernandez observed a green van parked on the side of the street with someone in the driver's seat. The officers knew that the CPD had received numerous complaints of drugs being sold from that van. Hernandez parked in front of the van, and he and McClain exited their vehicle and walked together to the driver side of the van to conduct a field interview. The occupant of the van watched the officers as they approached, moved his hands toward his waistband, and repeatedly looked up at them and back down to his waistband. Hernandez identified defendant in court as the occupant of the van.

¶ 6       Hernandez and McClain announced their office to defendant. McClain opened the driver's side door. Hernandez, for safety reasons, ordered defendant to step out of the van. Defendant exited the van and, simultaneously, pushed both officers forcefully in the chest with his hands. Defendant attempted to flee, but Hernandez grabbed him around the waist, taking him down to the ground, then got on top of him. Hernandez reached for his handcuffs. Defendant then pushed the officer away and stood up. McClain, meanwhile, made a "10–1" radio report that an officer required assistance. As the officers attempted to apprehend defendant, he waived to other people on the street and said: "Come help me, folks." Hernandez explained that the word "folks" refers to members of the Gangster Disciples street gang. Defendant repeatedly pushed Hernandez away from him. McClain then went behind defendant, grabbed his belt, and pulled him to the side of the street, where they fell into a snowbank, with defendant on top of her.

¶ 7       Defendant attempted to get on his feet and break away from the officers. Hernandez struck defendant's legs with his baton and repeatedly ordered defendant to "[s]top resisting." Hernandez then observed defendant's right hand on McClain's gun. He dropped his baton, reached for his own gun, and felt defendant's hand on it. He looked down and observed defendant's left hand on his gun. Hernandez placed both of his hands on his gun and stepped back. McClain also placed both of her hands on her gun, at which time defendant jumped to his feet and fled. Hernandez chased defendant, but then saw several men approaching McClain, so he returned to assist her. Hernandez then radioed a description of defendant and the direction in which he fled.

¶ 8       Hernandez had three to four lacerations to his right middle finger which were bleeding, and a laceration to his left knee. He was taken by ambulance to an emergency room where he was treated and released.

¶ 9       On cross-examination, Hernandez admitted that the term "folks" has additional meanings.

He did not memorialize the statement, "Folks, come help me. Come help me." in any reports but told a detective or an investigator about the statement.

¶ 10    McClain testified substantially the same as Hernandez regarding their observations of defendant as they approached the van, and their attempts to apprehend defendant. On that day, she wore her badge and her gun and handcuffs were also visible on her duty belt. She opened the driver side door of the van and stated to defendant: "Chicago police, step out of the car." When defendant exited the van, he stated: "I don't want any problems," then pushed both officers in the chest with his hands. Defendant attempted to flee, but Hernandez grabbed him around the waist and pulled him down to the ground. Hernandez laid on top of defendant, wrestled with him, and tried to handcuff him. McClain radioed for assistance. Defendant attempted to stand up and pushed Hernandez. Hernandez attempted to grab defendant, but defendant pushed him away and punched him. Defendant stated, "come on, folks, come on, folks." McCain explained that "folks" meant "[o]ther gang members." McClain then grabbed the back of defendant's belt, pulled him to the side of the street, fell into a snowbank in a sitting position, and pulled defendant down onto her lap. Hernandez struck defendant in the arms, hands, and legs with his baton and ordered him to "[s]top resisting." McClain felt a tugging on her right side and felt her duty belt move. She then saw defendant's right hand on the butt of her gun. Defendant repeatedly attempted to take McClain's weapon from her. While testifying, McClain in a demonstrative fashion "mov[ed] her arm in an upward fashion." She told Hernandez that defendant was "going for [her] weapon" and to "shoot him." McClain then released defendant's belt and placed her hands on top of his hands, which were still on her gun. Defendant pulled his hands and fled.

¶ 11    On cross-examination, McClain admitted that there are other meanings of the word "folks" and did not recall telling Detective Ron Rempas or his partner, who were assigned to investigate

defendant's case, that defendant stated, "come help me folks, come folks."

¶ 12 CPD Detective Patricia Walsh testified that she and her partner were on duty in their vehicle near 72nd Street and Wentworth Avenue when they heard a "10–1" call for officer assistance which included a description of a black male wearing a fur jacket and tan pants. She then observed a man, who matched this description, get into the passenger seat of a blue vehicle parked directly in front of them. The blue vehicle took off and proceeded southbound on Vincennes Avenue and turned right onto 75th Street toward Princeton Avenue. Walsh activated her emergency lights and attempted to curb the vehicle. When the blue vehicle pulled over, defendant got out and fled northbound on Princeton Avenue. The detectives pursued defendant on foot through a parking lot where defendant jumped over a spiked wrought iron fence. Defendant's pants caught on a spike, but he ripped himself free, fell over the fence, and fled. Walsh was unable to pursue defendant further, so she radioed for assistance.

¶ 13 CPD Officer Michael Keeney testified that he was on duty near the 7400 block of Princeton Avenue when he received a 10–1 call on the radio. He conducted a yard-by-yard search and discovered defendant hiding under a porch and placed him under arrest.

¶ 14 Rempas testified that he was assigned to defendant's case and spoke to Hernandez, McClain, and defendant. Hernandez and McClain viewed a line-up on the evening of the incident and identified defendant.

¶ 15 The next day, Rempas and his partner took defendant into an interview room and advised him of his *Miranda* rights. Defendant informed Rempas that he lived at 7132 S. Wentworth Avenue. On the day of the incident, he was sitting in his van after a verbal altercation with his wife and, as a result of the argument, was angry. He then smoked some marijuana which made him feel extremely high. Shortly thereafter, defendant fell asleep in the van and awoke to Hernandez and

McClain at the driver side of the van. When he exited his vehicle, he shoved the officers away from him because he was still very high and did not know what the officers wanted or what they were doing. After he shoved them, one of the officers grabbed defendant and he pushed the officer away. Defendant struggled with one officer to the ground. Defendant was then pulled back by one officer and struck in the legs with a baton by the other. During the struggle, the male officer fell backward onto the other officer, and defendant got up and fled. Defendant said he jumped into a car driven by a man named "Dude," who drove them away from the scene. The police curbed the vehicle and defendant fled. As he jumped a fence, defendant's leg was caught on the fence, and he ripped his pants. Defendant then hid under a nearby porch where the police arrested him. He never requested to go to a hospital.

¶ 16    Following this testimony, the State rested. The trial court denied defendant's motion for directed findings.

¶ 17    Ernestine Henry testified that she knew defendant from the neighborhood but was not friends with him. On December 29, 2010, Henry was walking to her car on the same side of the street where the van was parked. When she was approximately 10 feet away from the van, she observed a woman, who wore jeans and a hoodie, exit a "regular car" and "snatch" defendant out of his vehicle. She did not see the woman wearing a badge or a vest. Once defendant was out of his vehicle, a man approached and placed defendant in a choke hold. Henry then got into her car and drove home.

¶ 18    On cross-examination, Henry indicated that she did not believe the two people were police officers. She did not call 911 and did not attempt to get help. She was not a friend of either defendant or his wife. She saw defendant's wife in a store approximately three weeks before defendant's trial, and they exchanged telephone numbers. Approximately two weeks later, Henry

learned the date of the trial from a phone conversation with defendant's wife.

¶ 19    Defendant's wife, Alonda Grandberry, testified that on the morning of the incident, she was inside the house preparing for work while defendant was outside warming up the van. When she went outside, she observed a gray car pull in front of defendant's van. A woman exited the car, approached the van, and snatched defendant out of it. Defendant "snatched back."

¶ 20    A male then approached defendant and grabbed him around the neck. A "tussle" ensued between defendant and the male. Aldona testified that "the off——, the lady was pulling [defendant] by the back of his jacket." The woman fell, but she could not see whether the woman was on top of defendant because of the snow. The male used a stick "they" carry and began to strike defendant with it. She did not see defendant touch the woman's gun. She observed the incident from the door of her apartment building, which was less than 50 feet away, and directly across the street from where defendant's van was parked.

¶ 21    On cross-examination, Aldona indicated that she knew the woman and the man were police officers as soon as defendant was pulled from his van and that she believed they were simply harassing defendant. She spoke with Henry for the first time by phone approximately one week before the trial began.

¶ 22    Defendant testified on his own behalf and admitted that he had prior convictions during the following colloquy with trial counsel:

"Q. You have been convicted of crimes before?

A. Yes.

Q. About how many times?

A. I got ten prior convictions.

Q. And do you recall what they were for?

A. Drug cases and aggravated battery to police."

¶ 23    On December 29, 2010, defendant was sitting in his van waiting to drive his wife to work when a gray car parked in front of the van. A male and female got out of the grey car and approached the van. He did not immediately realize they were police officers. The female "snatched my door open, grabbed me out [of] the car and told me I was under arrest." She pulled out handcuffs and he tried to break away.

¶ 24    The male approached him and grabbed him by the neck while he struggled to get away. The female then grabbed him from behind while the male continued to keep his hold on defendant. He continued his attempts to flee. The female then dragged him by his jacket to the other side of Wentworth Avenue, and, in the process, she fell backward, pulling him to the ground and on top of her. At this point, he did know they were police officers, and noted they were both carrying firearms. The male was striking him with his "billy club" while he attempted to stop the blows. He did not go for their weapons, not even inadvertently. He was able to eventually get away and fled.

¶ 25    When he reached 73rd Street, he recognized someone he knew as Mark sitting in a car. He told Mark the police were trying to kill him and got into the passenger seat of Mark's vehicle. Mark drove away and at 74th Street and Wentworth Avenue, a police car with its lights and siren activated pulled over Mark's vehicle. Defendant exited the vehicle and fled. While he was running away, the police shot at him twice. He ran through a parking lot and climbed a fence. While he was climbing over the fence, his leg was grazed by a bullet. He hid under stairs because he believed the police were trying to kill him.

¶ 26    Defendant denied resisting the police but acknowledged that he had pulled away from them to avoid being handcuffed. He believed he was in danger from the police officers who were the aggressors. Defendant stated that while he was at Cermak Hospital in the jail, he informed the

attendants that a bullet had grazed his leg. However, his Cermak medical records did not include a report of a gunshot wound.

¶ 27    On cross-examination, defendant testified that he realized when McClain took out her handcuffs, they were police officers, but he did not want to get arrested.

¶ 28    In closing, the State argued that defendant lacked credibility for a number of reasons including that he was a "10-time convicted person also convicted of aggravated battery to a PO."

¶ 29    At the conclusion of trial, the trial court made oral findings based on its consideration of the witnesses' testimony and assessment of their credibility. The trial court "absolutely agree[d] with both sides to some extent."

¶ 30    The trial court concluded that Henry did not have "any real relevant information," and was "not really a true witness" to the incident. The trial court noted inconsistencies during Aldona's testimony as she referred to the woman who pulled defendant from the van as "off——." The trial court believed Aldona was about to say "officer" and that she knew they were the police. The trial court further found defendant was aware that McClain and Hernandez were police officers from "the very minute" he was pulled from his van. The trial court noted discrepancies in defendant's testimony on direct and cross examination as to when he knew McClain and Hernandez were police officers. The trial court also noted that defendant admitted to his attempts to break free from the officers, thereby resisting arrest. The trial court stated defendant had no legal basis nor right to resist the officers. Further, the trial court noted that Alonda and defendant admitted that there was a struggle and tussle between the officers and defendant, which was consistent and supportive of the officers' testimony. The trial court found that Hernandez received injuries that were the proximate cause of his attempt to arrest defendant.

¶ 31    As to the testimony regarding defendant reaching for McClain's gun, the trial court found

the officers' testimony "exceedingly credible, especially Officer McClain." The trial court explained that McClain stood up to demonstrate how defendant was pulling on her belt as he was attempting to remove her gun and found her testimony regarding this incident was "exceedingly believable and credible."

¶ 32     Based on these findings, the trial court found defendant guilty of resisting and injuring Hernandez and attempting to disarm McClain. The trial court found defendant not guilty of attempting to disarm Hernandez and explained that although Hernandez's testimony was "exceedingly credible," it did not make sense that defendant's hands were on both of the officers' guns at the same time and, possibly, that some contact with Hernandez's gun had occurred during the struggle. The trial court also found defendant not guilty of the aggravated battery charges but gave no further explanation. The trial court subsequently sentenced defendant to concurrent terms of 13 years' imprisonment.

¶ 33     Defendant appealed. Defendant's appellate counsel, in his brief, incorrectly asserted that Hernandez did not testify or corroborate McCain's testimony at trial. Defendant argued that the State failed to prove him guilty beyond a reasonable doubt because McCain's testimony was not credible, should be "totally disregarded," and was contradicted by the testimony of Henry and Aldona. He further argued that it may be presumed that the trial court did not find McCain's testimony believable, where it found him not guilty of the aggravated battery charges.

¶ 34     This court affirmed defendant's convictions.

¶ 35     On December 3, 2015, defendant filed a *pro se* petition for relief of judgment and on April 6, 2016 he filed an amended *pro se* postconviction petition. His amended petition included a contention that he received ineffective assistance of trial and appellate counsels. Defendant's *pro se* petition advanced to the second stage by operation of law. An attorney filed an appearance on

behalf of defendant, an Illinois Supreme Court Rule 651(c) (eff. Jul. 1, 2017) certificate, and a supplemental petition.

¶ 36    The supplemental petition contended that trial counsel was ineffective for failing to object to evidence regarding defendant's "gang affiliation" and for eliciting eight inadmissible prior criminal convictions during defendant's direct-examination. The supplemental petition also contended that appellate counsel was ineffective for failing to raise ineffective assistance of trial counsel on direct appeal.

¶ 37    The State filed a motion to dismiss. On January 6, 2021, following a hearing, the postconviction court dismissed all of defendants claims except for the ineffective assistance of trial and appellate counsel claims and the matter proceeded to a third-stage evidentiary hearing.

¶ 38    At the third-stage evidentiary hearing, the parties entered into evidence the record from the direct appeal, the parties' direct-appeal briefs, defendant's correspondence with the appellate clerk, a transcript of the preliminary hearing, certified copies of defendant's four prior convictions, and defendant's criminal history report tendered with his 2011 Presentence Investigation Report. These documents showed that defendant had at least 10 prior felony convictions at the time of his August 2011 bench trial. Two of those convictions occurred in 2002: one for possession of cannabis and one for felony cannabis possession in Cook County. The other eight convictions fell outside of the 10-year time limit for the admissibility of prior convictions under *People v. Montgomery*, 47 Ill. 2d 510 (1971), which included defendant's 2000 conviction for aggravated battery of a peace officer in Cook County, for which defendant was released from prison on February 26, 2001.

¶ 39    Defendant testified that his family hired Charles Zuganelis to represent him. Defendant had known Charles for 10 years; he had represented defendant on at least five prior cases.

¶ 40    Defendant first spoke with Charles about testifying on the day of trial. Charles did not prepare questions or practice any questions with him. Charles told him to disclose his criminal history but did not tell him to limit the history to convictions within the last 10 years. At the third-stage hearing, he could not recall how many convictions he had in the 10 years leading up to August 2011. At trial, he testified that he had 10 prior convictions, which were over the course of his lifetime, and some were older than 10 years. He recalled convictions for "PCS and aggravated batteries to a PO." He was arrested in 1998 for aggravated battery to a peace officer and later convicted. He served three years in prison and was released on February 16, 2001.

¶ 41    He hired George Zuganelis, Charles's brother, to represent him on appeal. He met George in court and his wife paid George to cover the cost of the transcripts and the appellate work. George did not discuss any appellate issues with him and did not suggest that he hire a different attorney to represent him on appeal. After hiring George, he never spoke to George again. He did not receive a copy of his trial transcripts, the direct appeal brief, nor this court's decision from George.

¶ 42    On cross-examination, defendant testified that he trusted Charles because he had known him for over 10 years at the time of his trial. He could not recall whether Charles failed to object and impeach witnesses at trial. He denied contacting or trying to hire Charles for legal services in a subsequent criminal case and insisted that his family hired Charles against his wishes.

¶ 43    Charles testified that he was admitted to the Illinois State Bar in 1982 and was an active member in good standing. He was a solo practitioner and also worked with George. He first represented defendant in the early 1990s and had represented him on misdemeanor, traffic, and felony matters. Charles believed that a family member or friend first hired him to represent defendant, but defendant hired him for subsequent cases. Within the last two years, Charles, again, appeared on defendant's behalf.

¶ 44   Prior to the bench trial in this case, Charles met with defendant "all the time" at the courthouse both before and after court proceedings. He and defendant decided that defendant would testify after the State started to present its case. In preparing defendant, he spoke with defendant about his testimony in "generalities" and told him what to expect and to tell the truth. He did not recall telling defendant not to disclose certain convictions that were more than 10 years old. He was aware of defendant's criminal history because he received "his wrap sheets" in discovery. He employed George, who had appellate experience, to review the trial record and write defendant's appellate brief. Charles reviewed the brief and signed it.

¶ 45   On cross-examination, Charles testified that in his criminal defense experience, police officers often testify to things that are not contained in their police reports. He explained that when such undisclosed statements are elicited on direct-examination, his trial strategy was to confront the officers on cross-examination. He described his cross-examination style, in general, as "aggressive." As defendant's gang affiliation was not relevant, on cross-examination, he decided to attack the officers' use of the word "folks" and show that the officers were trying to take a normal word and turn it into something else. He also impeached the officers by showing that the statement including the word, "folks", was not in their reports.

¶ 46   During defendant's trial, the defense theory was that when defendant was first approached by police, he had done nothing wrong and was not trying to disarm the officers but trying to get away. This theory was successful on the four counts where defendant was found not guilty.

¶ 47   George testified that he is retired from the legal profession, but in April 2012, he shared office space with Charles. He represented defendant on appeal and wrote the brief, which was signed and filed by Charles on April 30, 2012. He was suspended from the practice of law effective

April 9, 2012 for a period of 30 days. If he had believed that Charles committed error at trial, he would have discussed it with Charles and referred defendant to another firm for representation.

¶ 48    Following arguments, the postconviction court denied the supplemental petition in a written order with the following findings. Although trial counsel's performance fell below an objective standard of reasonableness where he elicited inadmissible prior convictions, defendant suffered no prejudice where there was "strong evidence of his guilt." The evidence at trial was not closely balanced and the evidence that defendant attempted to disarm McClain, a peace officer, was overwhelming. Trial counsel's decision not to object to the gang affiliation testimony, but rather to cross-examine was a matter of trial strategy, not error. Furthermore, defendant failed to establish prejudice where the trial judge was presumed to know the law and there was strong evidence of guilt. Lastly, based on these findings, defendant did not establish that his appellate counsel was ineffective for failure to raise the claims of ineffective assistance of trial counsel, where there was not a reasonable probability that the claims on appeal would have been successful.

¶ 49    Defendant appealed.

¶ 50    On appeal, defendant argues that the postconviction court erred in denying relief on his claims of ineffective assistance of trial counsel for his decision to front eight inadmissible prior convictions during direct-examination and failure to object to gang evidence and on his claim of ineffective assistance of appellate counsel for his failure to raise these claims of ineffective assistance of trial counsel on direct appeal. Defendant seeks a new trial on his conviction for attempting to disarm McClain, only.

¶ 51    The Act (725 ILCS 5/122–1 et seq. (West 2022)) provides a method by which a criminal defendant can assert that his conviction was the result of a substantial denial of his rights under the United States or Illinois Constitutions or both. *People v. Petrenko*, 237 Ill. 2d 490, 495-96

(2010). In noncapital cases, the Act provides for three stages. *People v. Carter*, 2017 IL App (1st) 151297, ¶ 125. Here, defendant's postconviction claims of ineffective assistance of counsel were denied at the third stage after an evidentiary hearing.

¶ 52    At a third stage evidentiary hearing, the postconviction court may receive "affidavits, depositions, testimony, or other evidence, and may order the [defendant] brought before the court." *People v. Jean*, 2014 IL App (1st) 220801, ¶ 28. The postconviction court serves as the fact finder, determining witness credibility, deciding the weight to be given testimony and evidence, and resolving any evidentiary conflicts. *People v. Domagala*, 2013 IL 113688, ¶ 34 (citing *People v. English*, 2013 IL 112890, ¶ 23). The postconviction court also determines whether the evidence demonstrates that the defendant is, in fact, entitled to relief. *Domagala*, 2013 IL 113688, ¶ 34. Where fact-finding and credibility determinations are involved, we will not reverse the court's decision unless it is manifestly erroneous. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). If no fact-finding or credibility determinations were made and the issues presented were all pure questions of law, a *de novo* standard of review is applied. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137. Ineffective assistance of counsel claims usually involve mixed questions of law and fact. *Id.* Therefore, in reviewing defendant's claims of ineffective assistance of trial and appellate counsels, we defer to the postconviction court's findings of fact and will disturb them only if they are "against the manifest weight of the evidence," but we review *de novo* the court's "ultimate decision of whether counsel rendered ineffective assistance." *Id.*

¶ 53    Every defendant has a constitutional right to the effective assistance of counsel. *Domagala*, 2013 IL 113688, ¶ 36. To determine whether defendant was denied his right to effective assistance of counsel, we apply the two-pronged test set forth in *Strickland v. Washinton*, 466 U.S. 668 (1984). Defendant must show that "counsel's representation fell below an objective standard and

-15-

that they were prejudiced such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Williams*, 2017 IL App (1st) 152021, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). If the defendant fails to meet either prong of the *Strickland* test, his claim must fail. *People v. Perry*, 224 Ill. 2d 312, 342 (2007). Thus, where an ineffectiveness claim can be disposed of on the ground of insufficient prejudice, a reviewing court need not consider whether counsel's performance was deficient. *Id.*at 342.

¶ 54    Here, we need not address whether trial counsel's decision to front eight inadmissible prior convictions and failure to object to gang evidence amounted to deficient representation. We can decide the claims on the *Strickland* prejudice prong. Regardless of any deficient performance by trial counsel, the postconviction court found defendant had not met his burden as to prejudice in that the trial court, at a bench trial, was presumed to know the law and the evidence was not closely balanced, but rather the evidence that defendant attempted to disarm McClain was overwhelming. We cannot say that finding as to prejudice was against the manifest weight of the evidence.

¶ 55    To prove defendant guilty of attempting to disarm a peace officer, the State was required to show that defendant attempted to take a weapon from a person he knew was a peace officer, without that officer's consent, while the officer was performing their official duties. 720 ILCS 5/31-1a(b) (West 2010), To prove attempt, the State was required to establish that defendant intended to commit a specific offense and performed an act that constituted a substantial step toward committing that offense. 720 ILCS 5/8-4(a) (West 2010).

¶ 56    Officers McClain and Hernandez testified that at the time of the incident, they were on duty and attempting to conduct a field interview of defendant who was sitting in a van connected

with drug dealing. They were both wearing bulletproof vests over their clothes with their police badges and name tags displayed on their vests. McClain's gun and handcuffs were visible on her duty belt. The officers announced their office and asked defendant to exit the van. During his own testimony, defendant acknowledged that, at some point, he observed McClain's handcuffs as she attempted to arrest him; he knew they were police officers but attempted to break free regardless.

¶ 57 After defendant was removed from the van, he forcefully pushed the officers leading to a struggle. Both officers testified that, during the struggle, they saw defendant's right hand on McClain's gun. McClain testified that defendant repeatedly yanked and pulled up on her gun and demonstrated defendant's actions for the court. Both officers, defendant, and defendant's wife testified that the struggle between defendant and the officers was lengthy. In ruling, the trial court, found that the testimony of both McClain and Hernandez regarding defendant reaching for McClain's gun was "exceedingly credible" and there were inconsistencies in defendant's testimony. The postconviction court's finding that the evidence was not closely balanced as to the charge of attempting to disarm McClain was not against the manifest weight of the evidence.

¶ 58 Defendant argues that the evidence was closely balanced and that but for trial counsel's decision to front inadmissible convictions and to not object to testimony indicating that he was affiliated with a gang, there is a reasonable probability that the outcome would have been different.

¶ 59 However, defendant was tried at a bench trial rather than by a jury. In a bench trial, the trial court, as the trier of fact, is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *People v. Siguenz-Brito*, 235 Ill. 2d 213, 228 (2009). While the rules of admissibility of evidence are the same whether a trial occurs with or without a jury, in a bench trial, the trial court is the trier of fact and "a trial judge is presumed to know the law and only consider competent and admissible

evidence." *People v. Williams*, 246 Ill. App. 3d 1025 (1993). "This presumption may only be rebutted where the record affirmatively establishes that the trial judge in fact considered inadmissible evidence." *Id.* at 1033.

¶ 60 The record does not affirmatively establish that the trial judge relied on or considered defendant's prior inadmissible convictions or the gang affiliation evidence in finding defendant guilty of attempting to disarm McClain. The testimony regarding the prior convictions and defendant asking for help from "folks" were small portions of the evidence. The trial court did not separately question the witnesses on either issue. The State did not cross-examine defendant about the prior convictions. As to the officers' testimony about defendant seeking help from "folks," the officers on cross-examination were impeached on the omission of defendant's cry for assistance from their reports and they admitted the term "folks" had other meanings. The trial court in making its rulings did not mention the prior convictions or the gang affiliation testimony. Instead, the record shows that the trial court relied on and considered the officers' credible testimony as to defendant's attempt to wrestle control of McClain's weapon during their lengthy struggle with defendant, and the corroborating testimony of defendant and his wife as to the nature of the struggle. The presumption that the trial court considered only admissible evidence is not affirmatively rebutted here.

¶ 61 Defendant cites *People v. Naylor*, 229 Ill. 2d 584 (2008), arguing that the presumption that the trial court considered only admissible evidence at a bench trial can be rebutted without expressed reliance from the trial court judge and that the evidence can be found to be closely balanced even where there is testimony from two police officers. We find this argument unconvincing.

¶ 62    In *Naylor*, the defendant was arrested, at the same time as several others, during a drug raid at an apartment complex. 229 Ill. 2d at 590-91. At the defendant's bench trial, two officers testified that they encountered the defendant in a stairwell and that the defendant sold them heroin. *Id.* at 588-91. The defendant, on the other hand, testified that he was leaving his apartment to pick up his son from school when he was apprehended. *Id.* During rebuttal, the State introduced the defendant's prior conviction, to which the defendant objected as the conviction was inadmissible under *Montgomery*. *Id.* at 604. The court participated in a discussion of the timeline of the conviction and overruled the defendant's objection. *Id.* The trial court found the defendant guilty on all counts and defendant appealed. *Id.* at 591. On appeal, this court held that the defendant was erroneously impeached with his prior conviction, which was inadmissible under *Montgomery*, but that the defendant had forfeited the issue. *Id.* This court reviewed the issue pursuant to plain error, reversed the defendant's convictions, and remanded for a new trial. *Id.* at 592. The State appealed.

¶ 63    On appeal, the supreme court also reviewed the *Montgomery* issue using a plain error analysis. *Id.* at 593. The supreme court found that the trial court erroneously admitted the defendant's prior conviction in violation of the *Montgomery* rule. *Id.* 601. The error was reversible where the trial court improperly considered the incompetent evidence when it participated in a discussion as to its admissibility and overruled the defendant's objection. *Id.* at 605. Lastly, the supreme court found that the evidence was closely balanced where there was a "contest of credibility" between the officers' and the defendant's testimony. *Id.* at 610. The court found that the defendant's testimony was "consistent with much of the officers' testimony and the circumstances of his arrest" and at the close of testimony, the court "was faced with two different versions of events, both of which were credible." *Id.* at 607-08. However, "[m]omemts after erroneously admitting incompetent evidence for the purpose of impeaching defendant's

credibility, the [trial] court concluded that it believed the officers' version of events." *Id.* The supreme court "err[ed] on the side of fairness" and reversed the defendant's convictions. *Id.*

¶ 64    *Naylor* is distinguishable. First, the supreme court found that where an objection to the inadmissible evidence is made and overruled it cannot be presumed that the evidence did not enter into the court's consideration. *Id.* at 605. Here, in contrast, the trial court did not rule on the admissibility of the prior convictions or gang affiliation evidence and did not have discussions with the parties about this evidence. The trial court did not enter its decision "moments" after the improper evidence was elicited. And as discussed, the trial court did not address and did not discuss defendant's prior convictions or gang affiliation evidence when makings its findings.

¶ 65    Second, the supreme court in *Naylor* found that the evidence was closely balanced as to the defendant's alleged sale of drugs in part because the officers testified that they did not see the recovery of the prerecorded currency from the defendant and the State did not call the officer who did recover the currency. *Id.* at 606-08 In contrast, in this case, the two officers testified to all of the elements of the charge that defendant attempted to disarm McClain.

¶ 66    Defendant argues that the facts of the case came down to the credibility of the officers against defendant, creating a credibility contest and therefore the evidence was closely balanced under *Naylor*. However, the majority in *Naylor* flatly rejected the dissent's suggestion that it was creating "a rule holding that if the evidence at trial involves a contest of credibility, and the defendant testifies contrary to the prosecution's witnesses, the evidence will always be closely balanced." *Id.* at 615-16 (Thomas, C.J., dissenting, joined by Garman and Karmeier, JJ.) The court explained: "It is axiomatic that whether the evidence in a criminal trial is closely balanced depends solely on the evidence adduced in that particular case." *Id.* at 609. Here, the trial court found the officers' testimony "extremely credible" and specifically found that McClain's testimony

regarding defendant yanking and pulling on her gun was extremely believable and credible. The evidence was not closely balanced.

¶ 67    Therefore, the postconviction court's finding that defendant was not prejudiced was not against the manifest weight of the evidence and we find that defendant failed to establish that his trial counsel's performance amounted to ineffective assistance of counsel.

¶ 68    Defendant lastly argues that his appellate counsel provided ineffective assistance where he failed to raise ineffectiveness of trial counsel on direct appeal.

¶ 69    Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel. See *People v. Childress*, 191 Ill. 2d at 175. A defendant must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced defendant. *People v. West*, 187 Ill.2d 418, 435 (1999). If the underlying claim is not meritorious, defendant suffered no prejudice. *Id.*

¶ 70    Because defendant's claims for ineffective assistance of trial counsel have no merit, defendant has suffered no prejudice due to appellate counsel's failure to raise the issue on appeal. See *People v. Childress*, 191 Ill. 2d 168, 175 (2000). Therefore, defendant has failed to establish that his appellate counsel's performance amounted to ineffective assistance of counsel.

¶ 71    For the reasons stated above, defendant has not established that his trial and appellate counsels' performances amounted to ineffective assistance of counsel. Therefore, we affirm the third-stage denial of defendant's supplemental petition.

¶ 72    Affirmed.